IN RE APPLICATIONS OF EASTERN NEBRASKA PUBLIC POWER DISTRICT AND CITY OF AUBURN, NEBRASKA.
CITY OF AUBURN ET AL., APPELLANTS, V. EASTERN NEBRASKA PUBLIC POWER DISTRICT, APPELLEE.
138 N. W. 2d 629
Filed December 10, 1965. No. 36015.

Yale C. Holland, John Ferneau, Clarence E. Heaney, Jr., Kennedy, Holland, DeLacy & Svoboda, Donald F. Stanley, Clarence A. H. Meyer, Attorney General, and Homer G. Hamilton, for appellants.

Marti, O'Gara, Dalton & Bruckner, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

CARTER, J.

The City of Auburn filed its application with the Nebraska Power Review Board on September 11, 1964, for an order authorizing it to construct a transmission line for the purpose of serving the city of Peru with electrical energy. The Eastern Nebraska Public Power District filed a protest to the application. On September 14, 1964, the Eastern Nebraska Public Power District filed its application with the Nebraska Power Review Board for authority to construct a transmission line to serve the city of Peru with electrical energy. The city of Auburn protested the granting of this application. The two applications were consolidated for hearing before the Nebraska Power Review Board. After a hearing the Nebraska Power Review Board denied the application of the city of Auburn and sustained that of the Eastern Nebraska Public Power District. The city of Auburn has appealed.

For the purposes of this opinion we shall refer to the city of Auburn as Auburn, the Eastern Nebraska Public Power District as Eastern, the city of Peru as Peru, the Peru State College as the college, the Board of Education of State Normal Schools as the board of education, and the Nebraska Power Review Board as the board.

The evidence in this case shows that Peru has been providing electrical energy to the college for several years from its power generating plant. The college uses almost one-half of the electrical energy produced by the Peru municipal plant. The college is within the territorial limits of Peru. The board of education and the college became apprehensive of the ability of Peru to provide adequate electrical energy to the college and entered into a contract with Auburn whereby the latter was to construct a transmission line and furnish electrical energy to the college at a flat rate of 1.45 cents per KWH. Peru was intending at that time to enlarge its generating capacity because it was about to lose its largest user. Auburn instituted an action in the district

court for Lancaster County against Peru to test the validity of the Auburn-board of education contract. The court held the contract invalid and Auburn and the board of education appealed to the Supreme Court, where the case is pending a final decision.

On June 30, 1964, the electors of Peru voted to purchase electrical energy at wholesale rather than increase the generating capacity of their generating plant and authorized the city council to purchase additional power at wholesale.

In order to serve the immediate needs of Peru and the college and at the same time to settle the litigation pending in the Supreme Court, Auburn, Peru, the board of education, and the college entered into a contract referred to in the record as the tripartite agreement. By this agreement, dated August 13, 1964, Auburn was to construct a transmission line and serve Peru with electrical energy at a flat rate of 1.26 cents per KWH. Peru in turn contracted with the board of education and the college to provide electrical energy to the college at a flat rate of 1.90 cents per KWH. The tripartite agreement provided for the length of time, manner and method of service, and the financial considerations usually contained in contracts of this type. Pursuant to this tripartite agreement, Auburn filed its application with the board to construct the transmission line in order to serve Peru in accordance with the tripartite contract. As we have heretofore stated, Eastern filed objections and filed its own application to construct a transmission line for the purpose of serving Peru.

The issues raised by the appeal are as follows: (1) Whether or not the board has jurisdiction of the controversy; (2) which of the two applications would best serve the public convenience and necessity; (3) whether or not the board has the authority to disregard the tripartite agreement in reaching its decision; and (4) which of the two applicants can more feasibly and economi-

cally serve Peru without unnecessary duplication of facilities and operations.

The municipal plant at Auburn has 4 diesel-driven generators with a total capacity of 4,950 kilowatts and firm generating capacity of 2,840 kilowatts. Auburn serves the towns of Brownville, Nemaha, Howe, Johnson, and Graf, in addition to Auburn itself, and the rural needs in those respective areas. By serving Peru, the generating needs of Auburn would, or would in the near future, require an extension of its generating facilities or the purchase of outside power. Auburn has a 12,500-volt line running almost due east to Brownville. The tripartite agreement requires Auburn to construct a 12,500-volt line from its Auburn-Brownville line approximately 6 miles north to Peru. The estimated cost of this line is $42,000, which Auburn is able to provide. Auburn has no rural customers along this proposed line, rural customers in the area being served by Eastern. The proposed transmission line would cross 4 distribution lines of Eastern and would parallel distribution lines of Eastern for approximately 1¼ miles, none of which has the load capacity to serve Peru. Within 5 to 7 years Auburn would be faced with additional costs of replacing the lines from Auburn to Peru with higher voltage lines if the projected increase of consumer use materializes.

Eastern has a 69,000-volt line running north and south approximately 3 miles west of Auburn. Eastern's application provides for the construction of a 69,000-volt line due east from this line to Peru. The cost of the line is estimated at $98,000. Eastern serves the rural needs north, west, and south of Peru, all of which is in Eastern's service area. The 69,000-volt line into Peru would not only serve Peru with all its power needs for the present and future, but would firm up its rural power distribution needs in its rural service area. It is the contention of Eastern that the transmission line proposed by Auburn is an invasion of Eastern's service area and an unwar-

ranted duplication of service. Witnesses for Eastern testified that Eastern will furnish power to Peru at a flat rate of 1.23 cents per KWH. The evidence shows further that Eastern is interconnected with three other sources of wholesale power and that outage of its lines is consequently much less likely than on Auburn's proposed transmission line. The evidence conclusively indicates that both applicants are financially able to construct their respective proposed transmission lines.

It is upon the foregoing evidence that the board assumed jurisdiction of the subject matter, found that Eastern would best serve the public convenience and necessity, disregarded the tripartite agreement, and determined that Eastern could better supply the electric service to Peru under its proposed construction without the duplication of distribution lines or operations.

The first contention raised by Auburn is that the statute creating the board and defining its jurisdiction, sections 70-1001 to 70-1020, R. S. Supp., 1963, confers no powers in the board over the construction of transmission lines to be used for the transmission of electrical energy for wholesale use.

The parties to the present suit are all public corporations over which the Legislature has plenary control. The right to regulate and control such corporations rests with the Legislature, as we have many times held. The purpose of sections 70-1001 to 70-1020, R. S. Supp., 1963, as stated in the first section thereof, is to avoid and eliminate conflict and competition between public power districts, public power and irrigation districts, municipalities, electric membership associations, and cooperatives in furnishing electrical energy to retail customers, to avoid and eliminate the duplication of facilities and resources which result therefrom, and to facilitate the settlement of rate disputes between suppliers of electricity. It was clearly the intention of the Legislature that the public corporations of the state engaged in the generation, transmission, and distribution of elec-

trical energy should eliminate conflict and competition among themselves and to prevent duplications of facilities and resources which result in a higher cost of electrical energy to the ultimate user. Sections 70-1001 to 70-1020, R. S. Supp., 1963, were clearly enacted by the Legislature to accomplish this purpose.

It is true that the act deals at length with practices in the retail distribution and sale of electrical energy and the service areas in which suppliers of electrical service may operate. However, sections 70-1012 and 70-1013, R. S. Supp., 1963, purport to deal with matters not directly related to retail electrical service. Section 70-1012, R. S. Supp., 1963, states in part: "Before any electric generation facilities or any transmission lines or related facilities carrying more than seven hundred volts are constructed by any supplier other than a municipality within its corporate limits and its zoning area outside such corporate limits, an application, filed with the board and containing such information as the board shall prescribe, shall be approved by the board; * * *" followed by specific exceptions not material here. Section 70-1013, R. S. Supp., 1963, provides for the filing of an application, notice, and hearing of matters authorized and required by section 70-1012, R. S. Supp., 1963.

Section 70-1012, R. S. Supp., 1963, relates to "any" electric generation facility or "any" transmission lines or related facilities carrying more than 700 volts to be constructed by "any" supplier, and provides that the construction of such lines must be approved by the board. The section is not limited to retail suppliers by specific language or by implication. It cannot logically be contended that the limitation of the statute on the duplication of transmission lines carrying power for wholesale, or the restrictions on the construction of unneeded and uneconomic transmission lines, is not germane to the providing of electrical energy to the ultimate user as economically and feasibly as possible, consistent with sound business practices. The

plain language of the act confers power on the board to exercise its stated authority as to the construction of any transmission line carrying more than 700 volts of electrical energy, whether for wholesale or retail sale by any public corporation specified in the act.

An administrative board has no power or authority other than that specifically conferred upon it by statute or by a construction necessary to accomplish the purpose of the act. Scotts Bluff County v. State Board of Equalization & Assessment, 143 Neb. 837, 11 N. W. 2d 453; County of Antelope v. State Board of Equalization & Assessment, 146 Neb. 661, 21 N. W. 2d 416. The clear and unambiguous language of section 70-1012, R. S. Supp., 1963, sustains the jurisdiction of the board over the transmission lines involved in the present case.

It is the contention of Auburn that, even if the statute grants authority to the board over transmission lines carrying electrical energy for wholesale, it can have no application in the instant case for the reason that its enactment does not conform to constitutional requirements. It is the contention of Auburn, in part at least, that the statute is amendatory in character and that it failed to repeal certain statutes authorizing Auburn to enter into the tripartite agreement. By section 19-2701, R. R. S. 1943, a city of the first or second class is authorized to contract for the sale of electrical energy beyond the corporate limits of such city. By section 70-502, R. R. S. 1943, any city is authorized to enter into agreements to purchase or sell electrical energy and to connect or interconnect its electric light and power plants, distribution systems, and transmission lines with those of any one or more other cities upon such terms as may be agreed upon. Although other conflicting sections of the statutes were amended and repealed, the foregoing sections were not mentioned in the act. It is the contention of Eastern that such statutes were amended by implication by sections 70-1001 to 70-1020,

R. S. Supp., 1963, which it contends is an act independent and complete in itself.

The sections of the statute here under consideration constitute a legislative entry into a field of regulation not theretofore exercised. It was an act complete in itself. It repealed statutes in conflict therewith. It specifically amended others to conform to the purposes of the new legislation. It is true that sections 19-2701 and 70-502, R. R. S. 1943, were neither repealed nor specifically amended by the act. There is no indication that the Legislature intended to deprive cities from entering into contracts for the sale or purchase of electrical energy outside of their corporate limits, although the statute did have the effect of limiting the power to contract where the city failed to get the approval of the board for the construction of a transmission line carrying more than 700 volts, necessary to comply with its contract. The effect of the statute before us was to place a limitation upon the construction of duplicating plants and transmission lines among public corporations, including cities, all for the public interest. We necessarily conclude that the act, now sections 70-1001 to 70-1020, R. S. Supp., 1963, is an independent and complete act to regulate an area in which the Legislature had not previously entered.

"An act complete in itself which covers the whole subject to which it relates may properly modify, change or destroy the effect of other statutes without contravening the provisions of the Constitution." Beisner v. Cochran, 138 Neb. 445, 293 N. W. 289.

In State ex rel. Meyer v. County of Lancaster, 173 Neb. 195, 113 N. W. 2d 63, we said: "Where a legislative act is complete in itself but is repugnant to or in conflict with a prior law which is not referred to nor in express terms repealed by the latter, the earlier statute is repealed by implication as to the latter act, but only to the extent of the repugnancy or conflict." See; also, State ex rel. Gage County v. Benton, 33 Neb. 834, 51 N. W.

144; Chicago & N. W. Ry. Co. v. County Board of Dodge County, 148 Neb. 648, 28 N. W. 2d 396; Jensen v. Omaha Public Power Dist., 159 Neb. 277, 66 N. W. 2d 591.

We necessarily conclude that sections 19-2701 and 70-502, R. R. S. 1943, are modified by sections 70-1001 to 70-1020, R. S. Supp., 1963, and that the former sections in no way limit the application of the latter. Auburn alleges that the grant of authority to the board over transmission lines which Auburn contracted to construct under the terms of the tripartite agreement is in violation of the impairment of contract clauses of the Constitution of the United States, Article I, section 10, and the Constitution of Nebraska, Article I, section 16. We can find no merit in these contentions. The provisions of the tripartite agreement are subject to sections 70-1001 to 70-1020, R. S. Supp., 1963, just as if they were included as a part of the tripartite agreement when it was made. These statutes were in effect on August 13, 1964, the date the tripartite agreement was entered into. The act was a proper regulatory provision with which Auburn must comply just as it assumed to do by the specific terms of the contract in making it subject to the favorable action of the board.

Auburn further contends that the grant of authority to the board, and its exercise by the board, are unconstitutional and void as violative of the due process clauses of the Constitution of the United States, the Fifth and Fourteenth Amendments thereto, and the Constitution of Nebraska, Article I, section 3, and, also, of the equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and Article I, section 1, of the Constitution of Nebraska. We find no basis for these contentions. The Legislature was acting within its province in enacting this legislation. It provided for notice and hearing, and a right of review, of the board's findings. The grant of quasi-judicial power to the board to determine controverted facts is the usual function of an administrative board. We fail

to see where there are any meritorious constitutional questions asserted under either the state or federal Constitutions.

It is argued that the tripartite agreement was entered into for the purpose of settling any contractual liability under the Auburn-board of education contract, the validity of which is being tested in the courts, as well as for the purchase of outside power at wholesale by Peru. Auburn contends that the board has no authority to disregard, and in effect invalidate, the tripartite agreement. It asserts that the board has no such authority, particularly when Eastern has no contract with Peru. Auburn contends that the board has no authority to substitute its judgment for that of the municipal authorities in the exercise of their right to contract for electrical energy.

We point out that sections 70-1001 to 70-1020, R. S. Supp., 1963, place the power to decide the factual issues as to the construction of more than 700-volt lines, not excepted from the act, in the board in accordance with the guidelines provided by the act. The right of the city to contract, when the construction of such lines is material to the agreement, is limited by the requirements of the statute under consideration. The statute is in effect a part of the contract and cannot be avoided for the reasons stated.

Auburn asserts that the evidence before the board was insufficient to sustain its conclusion. In this connection section 70-1014, R. S. Supp., 1963, provides: "After hearing, the board shall have authority to approve or deny the application. Before approval of an application, the board shall find that the application will serve the public convenience and necessity, and that the applicant can most economically and feasibly supply the electric service resulting from the proposed construction, without unnecessary duplication of facilities or operations." It is of course necessary that the findings of the board be sustained by evidence.

The evidence adduced by Eastern, which we have heretofore summarized, is sufficient to sustain the board's findings. The determination of the facts is peculiarly the province of the board and not this court. It is only where there is no evidence to sustain the action of the board or, for some other reason, the record shows the action of the board to be arbitrary and unreasonable that this court may void the action of the board. This has long been the rule on appeals to the courts from the decisions of administrative agencies.

"In determining this appeal, we may not substitute our judgment for that of the State Board. We review the record to determine if the State Board has complied with the requirements of the statutes in exercising the powers granted to it by legislative authority and, where the record is clear that it has, it is then our duty to hold its actions to be in accordance with the law." County of Howard v. State Board of Equalization & Assessment, 158 Neb. 339, 63 N. W. 2d 441.

"It cannot be seriously disputed that the legislature is clothed with power to delegate to administrative boards and agencies of the state the power of ascertaining the facts upon which the laws are to be applied and enforced. It may also authorize the doing of specific acts necessary to the furtherance of the purposes of the act. Such delegations of power and authorizations of acts do not transcend constitutional inhibitions so long as the law-making power is wholly reserved to the legislature and no part thereof has been delegated to any other governmental subdivision, board or agency." Board of Regents v. County of Lancaster, 154 Neb. 398, 48 N. W. 2d 221.

It appears that, during the course of the hearing before the board, a proposed merger of Eastern and Omaha Public Power District was entered into. Auburn moved to dismiss the application of Eastern on the theory that Eastern was no longer a legal entity or the real party in interest. The evidence shows that the

contract of merger was wholly executory, Eastern as an entity was still in existence, and the successor corporation, if the merger contract would be performed, would assume all the liabilities and commitments of Eastern. On the basis of this record, the board overruled the motions of Auburn to dismiss. We find no error in this ruling.

Auburn in its appeal set out 26 assignments of error. We have considered and disposed of those necessary to a decision in this case. We have examined the other errors assigned and conclude that they were without merit, unnecessary to a determination of the issues presented, or immaterial to the factual issues before the board.

We come to the ultimate conclusion that the board has jurisdiction of the subject matter and that the evidence before the board was sufficient to sustain its findings that the grant of Eastern's application will better serve the public convenience and necessity and most economically and feasibly supply electric service to Peru without duplication of facilities or operations. Under such circumstances this court is without authority to interfere with the result reached by the board.

AFFIRMED.