In re APPLICATION No. 10538 FILED BY THE METROPOLITAN UTILITIES DISTRICT OF OMAHA, NEBRASKA, FOR A PERMIT TO WITHDRAW, TRANSPORT, AND USE GROUND WATER. METROPOLITAN UTILITIES DISTRICT OF OMAHA, NEBRASKA, APPELLEE, v. MERRITT BEACH COMPANY ET AL., APPELLANTS.

140 N. W. 2d 626

Filed February 25, 1966. No. 36128.

Charles S. Reed, Dixon Adams, and Herman Ginsburg, for appellants.

George C. Pardee, Cecil S. Brubaker, and Lester A. Danielson, for appellee.

Ralph D. Nelson, Henry L. Holst, Vincent D. Brown, Arylss E. Brown, Stewart, Calkins & Duxbury, David L. Crawford, and George E. Svoboda, for amici curiae.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

CARTER, J.

This is an appeal from an order of the Director of Water Resources of Nebraska authorizing the Metropolitan Utilities District of the city of Omaha to supplement its water supply in the maximum amount of 60,-000,000 gallons of ground water per day from a well field located in Sections 29, 30, 31, and 32, Township 13 North, Range 13 East of the 6th P.M., and tax lots and government lots associated therewith, all located in Sarpy County on the north bank of the Platte River and an island therein. Numerous objections were filed to the grant of the application. Five objectors have appealed from the grant of the application, to wit: Bellevue Rod and Gun Club, Mr. and Mrs. Gerald Merritt, Merritt Brothers Sand and Gravel Company, Merritt Beach Company, and the County of Sarpy, who will hereafter be referred to as Gun Club, the Merritts, Merritt Sand Company, Merrit Beach, and Sarpy County, respectively. The Metropolitan Utilities District will be referred to as M. U. D.

The M. U. D. produced evidence showing that it was in the business of furnishing water to the city of Omaha and its environs. It showed that it was in need of water in the maximum amount of 60,000,000 gallons per day to provide adequate service to its customers with an estimated average use per day of 40,000,000 gallons. The proposed water wells were to be located on the north

bank of the Platte River and an island adjacent thereto in Sarpy County approximately 5 miles west of the confluence of the Platte River and the Missouri River. The water was to be pumped from a number of wells on property purchased by M. U. D., treated, and conveyed by pipeline to the service area of M. U. D. in and around the city of Omaha.

The objectors, or some of them, raise each of the following issues: (1) Section 46-639, R. S. Supp., 1963, is in violation of Article III, section 14, and of Article I, sections 3, 16, and 21, of the Constitution of Nebraska. (2) The grant of the application amounts to an unlawful diversion of water from one watershed to another. (3) The statute fails to properly limit the legislative powers granted to the Director of Water Resources or to fix adequate standards by which the authority granted is to be administered. (4) The grant of the application to take water for industrial and commercial purposes violates the preferred rights of the objectors to use it for domestic purposes. (5) The grant of the application would constitute a violation of the vested rights of riparian property owners, in that great damage will accrue by the lowering of the underground water table below the surface of their lands. After a hearing on the application and the objections filed thereto, the Director of Water Resources granted the application.

The evidence shows that the present facilities of M. U. D. for the furnishing of water to its customers are 140,000,000 gallons per day. The water is taken from the Missouri River and treated at its Florence station. Its future need, based on projected population and customer increases, has been determined to be a maximum of 60,000,000 additional gallons per day. The studies made by engineers and hydrologists indicated that the most feasible plan was to construct a well field of approximately 35 wells on the north bank of the Platte River and the island adjacent thereto, about 5 miles west of the mouth of the river on the riparian lands here-

tofore described. The island is designated in the record as Cedar Island and we hereafter designate it as such. The proposal includes a treating plant on or near the well field and a pipe line to transport the treated water into the present facilities of M. U. D. The estimated cost of the project is $15,030,000.

M. U. D. has purchased 600 acres of land in or adjacent to the Platte River upon which the well field and treating plant are to be constructed. The main current of the Platte River is south of Cedar Island. The island is separated from the north bank of the river by a chute which carries water only a part of the time. The plans show that 18 water wells will be constructed on Cedar Island and the remaining wells on the north side of the river. All of the water will be pumped from the ground, a direct diversion of water from the river not being contemplated.

By expert evidence it is shown that the aquifer from which the water is to be pumped underlies some 1,200 acres of land more than a mile wide and 50 to 100 feet in depth. The Platte River flows over the south edge of the aquifer. The wells are to be located 175 feet or more from the river and will be from 50 to 65 feet in depth.

The aquifer, which includes the 600 acres of land purchased by M. U. D., has the capacity of producing 60,-000,000 gallons of water per day. The evidence of the experts is that the source of the recharge of the aquifer, to replace the water pumped, will be 4,000,000 gallons per day from underground waters and 56,000,000 gallons per day from surface waters, primarily the Platte River. It is estimated that the aquifer would produce 60,000,000 gallons of water per day for 15 days after the Platte River contained no natural flow, if such an event would ever occur.

The expert testimony is to the effect that the operation of the pumps will lower the water table to its greatest depth at the location of the wells. This draw-down

of the water table tapers up and away from the bottom of the wells to the point where it has no effect on the static water table. The area thus affected between the point of productivity and the upward and outward slope to nonexistence is referred to as the cone of influence. The slope of the water table thus described produces the gradient which induces the movement of water that recharges the aquifer whatever be its source, including the surface water flowing in the Platte River. It is apparent from this evidence that there will be no lowering of the static water table beyond the cone of influence created by the pumping of 60,000,000 gallons of water per day. An expert hydrologist gave it as his opinion that the cone of influence would not extend beyond 5,000 feet to the north, 2,000 feet to the south, and 2,000 feet downstream to the east. The witness failed to express an opinion as to the extent of the cone of influence upstream to the west. All of the objectors own property or property interests to the east and below the proposed facility. The west or upstream extent of the aquifer is not therefore of any concern in this case.

The natural flow of the Platte River in years past was shown by the records of the United States Geological Survey. The natural flow and the corresponding rise and fall of the surface of the river was measured regularly for a period of years at the Louisville gauging station a few miles upstream from the site of the proposed well field. The average discharge of the river from May 1953 to September 1964, an 11-year period, was 5,220 cubic feet per second of time. The lowest discharge of the river on a single day occurred on September 3, 1955, the amount being 240 cubic feet per second of time. The average of the lowest flow of water on the lowest day in each year of this period is approximately 700 cubic feet per second of time. The average of the lowest consecutive 15-day periods of flow in each of the 10 years, 1954 to 1964, is 1,438 cubic feet per second of time. The lowest average 15-consecutive-day

period was 334 cubic feet per second of time, which occurred in the year 1954-1955. It is not disputed that the taking of 56,000,000 gallons of water is less than 93 cubic feet per second of time. This and other evidence indicates that the withdrawal of 60,000,000 gallons of water per day, the equivalent of 93 cubic feet per second of time, even if it all were diverted from the river, would not reduce the volume of the natural flow or the level of the river to the damage of the objectors.

Supported by this state of facts, M. U. D. made application to the Director of Water Resources for a permit as required by section 46-639, R. S. Supp., 1963, which provides: "An applicant which desires to avail itself of the provisions of sections 46-638 to 46-650 shall make application in writing to the Director of Water Resources for a permit. The application shall include (1) a statement of the amount of water for which a permit is desired together with an exhibit of maps showing the location of all wells, and (2) such other information as the director may deem necessary or desirable, and shall be accompanied by a fee in the amount of fifty dollars for the first five million gallons per day and an additional twenty dollars for each additional increment of five million gallons per day requested. The fee shall be based on the amounts of water requested on a daily average basis."

By section 46-638, R. S. Supp., 1963, the Director of Water Resources is authorized to grant and administer permits to cities, villages, or municipal corporations supplying water to cities and villages to develop ground water supplies in the area to be served by them. Other sections of the statute provide for the filing of an application for a permit, notice, the filing of objections, hearing, and review in the Supreme Court. Section 46-647, R. S. Supp., 1963, provides: "Nothing in sections 46-638 to 46-650 shall be construed as limiting any right of an owner of an estate or interest in or concerning land to recover damage for any injury done to his land or to

any water rights appurtenant thereto; nor shall sections 46-638 to 46-650 limit rights of condemnation which cities, villages and municipal corporations have under the laws of the State of Nebraska." Section 46-648, R. S. Supp., 1963, provides that the use of ground water pursuant to a permit granted by the Director of Water Resources shall be governed by the provisions of section 46-613, R. S. Supp., 1963. This section provides: "Preference in the use of underground water shall be given to those using the water for domestic purposes. They shall have preference over those claiming it for any other purpose. Those using the water for agricultural purposes shall have the preference over those using the same for manufacturing or industrial purposes. As used in this section, domestic use of ground water shall mean all uses of ground water required for human needs as it relates to health, fire control, and sanitation and shall include the use of ground water for domestic livestock as related to normal farm and ranch operations."

As we have heretofore stated, the objectors asserted in their objections filed with the Director of Water Resources, in opposing the issuance of a permit to M. U. D., that the grant of the permit would violate Article III, section 14, and Article I, sections 3, 16, and 21, Constitution of Nebraska. These same contentions are advanced in this court. In addition thereto, objectors contend in this court, for the first time, that the act is unconstitutional in that it delegates legislative authority to the Director of Water Resources without properly limiting the power delegated or providing the standards by which the granted powers are to be administered under our holding in Lincoln Dairy Co. v. Finigan, 170 Neb. 777, 104 N. W. 2d 227. It is the contention of M. U. D. that since this was not an issue raised by objectors in the hearing before the Director of Water Resources it cannot be raised in the first instance in this court in accordance with the long-established rule of

this court as stated in Lucas v. Board of Equalization, 165 Neb. 315, 85 N. W. 2d 638.

In this connection we point out that the power to declare an act of the Legislature unconstitutional is a judicial power reserved solely to the courts under the division of powers between the legislative, executive, and judicial branches of government set forth in the Nebraska Constitution. The Department of Water Resources is an administrative agency and, as such, has no authority to declare an act of the Legislature void because of unconstitutionality. Its function, in the performance of its delegated authority, is to give force to the presumption of constitutionality and comply with the provisions of the statute under which it is called upon to act. It would be a vain thing to require the raising of constitutional objections before a tribunal that has no authority to determine them.

It has been the practice in this court to consider constitutional questions in reviewing the orders of administrative agencies when raised in this court on direct review. City of Auburn v. Eastern Nebraska Public Power Dist., ante p. 439, 138 N. W. 2d 629. It is a general rule that the constitutionality of a legislative act must be raised at the earliest opportunity consistent with good pleading and orderly procedure, or it will be considered as waived.

This question appears to be one of first impression in this state. We think the proper rule is correctly stated in Wendlandt v. Industrial Commission, 256 Wis. 62, 39 N. W. 2d 854, wherein it is said: "However, the record does disclose that the unconstitutionality of the act was directly and positively asserted early and, certainly, as soon in the proceedings as it could be submitted to a judicial tribunal. The division between the power to make laws, to interpret and apply laws, and to execute laws may not be clear. In providing for enforcement of its enactments, the legislature may clothe administrative officers with power to ascertain whether certain specified facts exist, and thereupon to act in a

prescribed manner without delegating to such officers legislative or judicial power within the meaning of the constitution. (Citing authorities.) But the legislature cannot confer upon tribunals, other than courts, powers which are strictly and consistently judicial. The power to determine the constitutionality of a legislative enactment is strictly a judicial duty."

As to the time in which questions of constitutionality may be raised, it was said in Owen v. Mutual Benefit Health & Accident Assn., 171 Kan. 457, 233 P. 2d 706: "A similar statement of the rule is found in 12 C. J. 785 and 11 Am. Jur. 772. Each of these general authorities cites a number of federal and state decisions. And in Yakus v. United States, 321 U. S. 414, 64 S. Ct. 660, 88 Law Ed. 834, the court had occasion to say (page 444): 'No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'" In Cotton v. Iowa Mut. Liability Ins. Co., 363 Mo. 400, 251 S. W. 2d 246, the court said: "A constitutional question should be raised at the earliest practical opportunity." (Citing authorites.) See, also, Wendlandt v. Industrial Commission, *supra.* We conclude therefore that in an appeal from an order of an administrative agency direct to the Supreme Court, the question of constitutionality of the act, under which the administrative agency assumes its authority, can be first raised in the Supreme Court since it is the first time afforded to raise such an issue before a judicial tribunal.

It is the contention of M. U. D. that the objectors have failed to show a sufficient interest to raise the question of constitutionality. In Peterson v. Anderson, 100 Neb. 149, 158 N. W. 1055, this court said: "It is a well-established rule that no one can complain that a statute is unconstitutional unless he is injuriously affected thereby, and that the courts will not set aside

a law as violative of the Constitution for the reason that there is a possibility that one's interest may be injuriously affected in the future." In State ex rel. Nelson v. Butler, 145 Neb. 638, 17 N. W. 2d 683, this court said: "It is firmly established as the universal rule that a person 'may attack the constitutionality of a statute only when and so far as it is being or is about to be applied to his disadvantage; and to raise the question he must show that the alleged unconstitutional feature of the statute injures him and so operates as to deprive him of a constitutional right, and, of course, it is prerequisite that he establish in himself the claimed right which is alleged to be infringed.' 16 C. J. S., sec. 76, p. 162. We have held that, 'A party to a suit will not ordinarily be permitted to attack the constitutionality of a statute in a case where his rights and interests are not invaded or affected by its provisions.' State v. Brandt, 83 Neb. 656, 120 N. W. 196."

It is the contention of objectors, or some of them, that the withdrawal of 60,000,000 gallons of water from the ground at the site of the M. U. D. well field will reduce the water table under their lands to their damage. The M. U. D. called two expert witnesses, Vincent H. Dreeszen and Paul Bolton. Dreeszen is the assistant director, conservation and survey division, University of Nebraska. He has devoted most of his time since 1947 to the problems of ground water in Nebraska. Bolton is an engineer with Henningson, Durham & Richardson, an engineering firm in Omaha. He holds a bachelor of science degree in civil engineering with a major in rivers and streams and has worked considerably in hydrologics. No contention is made that these two witnesses were not qualified as experts in the field of hydrology.

The differences in their testimony were minor. They testify to their knowledge of the area here involved and to underground waters generally. They state that the operation of the pumps in the well field in withdrawing 60,000,000 gallons of water per day will lower the water

table approximately 50 feet at the point of withdrawal and that the water table will rise upward and outward until it meets the static underground water level. The cone-shaped depression in the water table thus created is designated as the cone of influence. It is the testimony of the experts that there will be no lowering of the water table beyond the perimeter of the cone of influence. Both experts testify that the cone of influence will not extend more than 5,000 feet to the north and not more than 2,000 feet to a half mile to the east. The land interests of the objectors are to the east or downstream from the well field and far beyond the cone of influence, relatively speaking. It is the opinion of the experts that the underground water level under objectors' lands will in no way be directly affected by the withdrawal of 60,000,000 gallons of water per day from the ground at the site of the well field. See Olson v. City of Wahoo, 124 Neb. 802, 248 N. W. 304, where this precise question was determined. The objectors produced no expert evidence and consequently the testimony of Dreeszen and Bolton is not disputed in the record.

It is the evidence, however, that the Platte River passes over the south edge of the aquifer and that the source of its recharge will be about 4,000,000 gallons per day from ground waters and 56,000,000 gallons per day from surface waters largely induced from the Platte River. It is asserted by the objectors that the operation of the well field will reduce the natural flow of the Platte River by 56,000,000 gallons per day and will result in the lowering of the water level of the Platte River by that amount. This is a fact beyond any dispute. From this it is argued that as the water table under their lands is influenced by the water level of the Platte River, it will lower the water table under their lands and damage their subirrigated lands and nearby lakes which have been put to industrial and recreational uses.

There is evidence in the record which shows the tabu-

lation of the gauging of the river at the Louisville gauging station as to the height of the surface of the river at stated times and the discharge of the river at corresponding times. From the gauging of the river and corresponding measurements of the volume of discharge over a period of time, it was established by relating one to the other that the drop in the surface of the river by the withdrawal of 56,000,000 gallons of water would be 1.06 inches. The withdrawal of 60,000,000 gallons of water would cause a surface drop in the river of 1.08 inches. This determination is not made from any recognized formula but from information gained from the regular gauging of the height of the river and the measurement of the volume of flow at corresponding times. From these statistics, kept over a long period of time, it has been determined that the lowering of the water level in the river carrying its average flow is approximately 1.1 inches per 100 cubic feet per second of time reduction in volume. Since the 60,000,000 gallons of water per day amounts to 93 cubic feet per second, and but 56,000,000 gallons per day is the draw-down from the river, it is evident from the record that the lowering of the water level at the point adjacent to the land of these objectors by the withdrawal of 56,000,000 gallons will not exceed 1.1 inches. Under this evidence the lowering of the river level will have only a negligible effect upon objectors' underground water which they assert is controlled by the rise and fall of the Platte River. In situations whereby the right of the riparian landowner to take percolating waters which interfere with the prior appropriation rights of persons on a nearby stream, the law of this state is silent. The question has been before the courts of California and Utah. Both courts prevented the taking by ground water users to the extent that such uses interfered with the prior appropriation rights. Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., 3 Cal. 2d 489, 45 P. 2d 972; Silver King Consol. Mining Co. v. Sutton, 85 Utah 297, 39 P. 2d 682.

In the Tulare case it is said: "The further finding that each riparian requires the 'whole of the underground flow of said stream * * * to moisten said land from beneath,' etc., is not sufficient under the new doctrine. The use of the entire flow of a stream, surface or underground, for subirrigation cannot be held to be a reasonable use of water in an area of such need as the Kaweah delta." If such is not the rule, every appropriation of water from a stream would be defeated by lower riparian owners having subirrigated lands because of the lowering of the water table which every diversion does to some extent. We determine therefore that the objectors have failed to show that their rights have been invaded and have such an interest as to entitle them to raise the question of constitutionality.

On the question as to whether or not the statute properly limits the powers granted to the director of water resources, and fixes adequate standards by which the authority granted is to be administered, the contentions of the objectors appearing to have great merit, a declaration of unconstitutionality at this time would leave M. U. D. in the position as before the act was passed, without any statutory limitation on its right to proceed with the construction of the facility. On this phase of the case the rights of the objectors to recover for damages to their property is not impaired. We fail to see where the declaration of unconstitutionality would benefit the objectors, the limitations proposed by the questioned act being solely a limitation upon the taker of water.

In this connection, however, it is asserted in effect that the objectors are owners of land or land interests in the watershed of the Platte River and, as such, are entitled to question the right of M. U. D. to take water from the Platte River watershed outside of that watershed for its municipal purposes. We think, because of the magnitude and importance of the question, and the interest of the objectors as resident riparian landowners

within the Platte River watershed, that this question must be determined. The right of a riparian owner to raise the issue was so sustained in Osterman v. Central Nebraska Public Power & Irr. Dist., 131 Neb. 356, 268 N. W. 334.

The objectors rely upon the Osterman case as supporting their contention that ground water cannot be transported and used outside of the Platte River watershed. In considering this question we point out that in 1866 the Legislature enacted the following: "So much of the common law of England as is applicable, and not inconsistent with the constitution of the United States, with the organic law of this territory, or with any law passed or to be passed by the legislature of this territory, is adopted, and declared to be law within said territory." 2 Complete Session Laws of Nebraska, 1866-1877, p. 12. Except for the change of the word "territory" to "state," the same provision exists as in section 49-101, R. R. S. 1943. Consistent with this enactment, this court has held: "The common-law rules as to the rights and duties of riparian owners are in force in every part of the state, except as altered or modified by statutes." Meng v. Coffee, 67 Neb. 500, 93 N. W. 713, 108 Am. S. R. 697, 60 L. R. A. 910. At common law a riparian landowner is entitled to have the stream flow through or by his land, essentially undiminished in quantity and unimpaired in quality, and he may make whatever domestic use of the water he desires and he does not forfeit those rights by nonuser. As to ground water, a riparian landowner at common law could withdraw whatever quantity of water for any purpose he chose without regard to the possible effects on his neighbor. But in humid England, the birthplace of the common law, the problem of arid and semiarid areas did not exist, and accounts for the fact that the use of water in a stream was limited strictly to riparian lands. Since riparian lands were in the watershed of the stream they touched, transportation outside the watershed for irri-

gation purposes was a problem not necessary to be considered. But under the common law doctrine, a riparian landowner could withdraw all the water he wanted from below the surface of his land, for any purpose, without regard to the effect on his neighbor, and he could transport it to where he chose. In the Osterman case this court said: "This necessitates the further conclusion that at common law there was in general no right to transport waters beyond or over the divide or watershed that inclosed the source from which obtained."

The first irrigation laws in this state were adopted in 1877 and 1889. These acts placed no limitations upon the quantity of water that could be appropriated, save and except that it must be for a useful purpose and within the capacity of the diversion works. Laws 1877, p. 168; Laws 1889, c. 68, p. 503. In 1895 the Legislature limited for the first time the quantity of water that could be appropriated to a specific amount and protected the rights to water acquired and appropriated prior to the passage of the act. Laws 1895, c. 69, §§ 20, 49, pp. 249, 262. Subsequent amendments to the irrigation law have been made, the entire result being that the adjudication of water rights and the priority of appropriation of water by diversion from rivers and streams for irrigation purposes have become the settled legislative policy of this state. Farmers Canal Co. v. Frank, 72 Neb. 136, 100 N. W. 286. In Enterprise Irr. Dist. v. Willis, 135 Neb. 827, 284 N. W. 326, we said: "That the state may supervise and control the appropriation, diversion and distribution of the public waters of the state and impose that duty upon administrative officers is settled by our former decisions."

It was not, however, until 1957 that the Legislature undertook any form of regulation of ground waters. In that year the Legislature enacted three statutes providing for the registration of irrigation wells, the spacing of such wells, and preferences in the use of ground water. Laws 1957, cc. 199, 200, 201, pp. 701, 704. In

1959 the Legislature provided for the creation of ground water conservation districts. Laws 1959, c. 221, p. 773. In 1961 the Legislature clarified existing statutes relating to ground water; changed the conditions for the registration of irrigation wells, for the plugging of abandoned wells, and for replacement wells; and provided for well drillers' certificates. Laws 1961, cc. 227, 230, pp. 671, 683. In 1963 the Legislature defined ground water and required that a permit be obtained to pump underground water within 50 feet of the bank of a natural stream. Laws 1963, cc. 274, 275, p. 827. In 1963 the statute presently before this court was enacted into law. It will be observed that acts of the Legislature were mere beginnings in the exercise of possible control and regulation of ground water. While the rights of appropriators to the use of water from rivers and streams have been protected over the years, rights in the use of ground water have not been determined nor protected, nor the public policy with reference to the use of such underground waters legislatively declared. The difficulties in administering dual conflicting principles, and fixing the rights of users thereunder, are readily apparent.

The Constitution of Nebraska provides that the necessity of water for domestic use and for irrigation purposes in the State of Nebraska is a natural want. Art. XV, § 4, Constitution. While this section of the Constitution has been related primarily to the diversion of water from rivers and streams, its relation to underground water is no different. Historically the state adopted the riparian right theory of the common law of England and subsequently impressed upon it the doctrine of appropriation. The rights of appropriators under the latter doctrine have been spelled out by statute and judicial interpretation while the rights of riparian landowners remain unsettled and undefined.

Underground waters, whether they be percolating waters or underground streams, are a part of the waters referred to in the Constitution as a natural want. Such

waters are as much a part of the hydrologic cycle as the flow of water in a stream or river. It is true that such waters are not concentrated as in a river nor do they move with the velocity of a river, but they do percolate through underground formations and have the same source and termination as surface water flowing in a river. Underground waters are a part of the source of water supply to a growing population and an expanding economy the same as the surface waters flowing in a live stream on the surface of the ground. Because of the ever-increasing demands for water control of underground waters as well as the flow of rivers and streams, it is becoming more important and extremely necessary that regulation and control of all sources of water supply be attained. Without any declaration of public policy as to the use of underground waters other than the constitutional declaration that they are a natural want, we adhere to the rule that such waters must be reasonably used for a beneficial purpose without waste. It is axiomatic that waters which flow beyond the points of use to the sea are lost and constitute a form of waste, which is against public policy.

While it is true that riparian rights still exist in this state and they remain unsettled and ill-defined, such rights have been limited by the rules of reasonable use and public interest. Where the reasonable use of the riparian landowner is not impaired, the public interest demands that such waters be applied to a needed public purpose rather than be lost by proceeding unmolested to the sea. The use of ground water by the inhabitants of a city for the purpose of health, convenience, and comfort is a public use of such water. Olson v. City of Wahoo, *supra*.

The common law rights of riparian owners have been modified in this state by what is known as the American doctrine. This doctrine has been defined as follows: " 'The American, as distinguished from the English rule, is that, while the owner of the land is entitled to appro-

priate subterranean or other waters accumulating on his land, which thereby becomes a part of the realty, he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land he owns, unconnected with the beneficial use of the land, especially if the exercise of such use in excess of the reasonable and beneficial use is injurious to others, who have substantial rights to the water.'" Silver King Consol. Mining Co. v. Sutton, *supra*. Under the foregoing theory we conclude that where the taking of water beyond a watershed causes no injury to appropriators or riparian owners, no reason exists for not permitting the use of waters for a public and beneficial purpose which would be otherwise lost. It is argued that the Osterman case, by analogy, sustains a contrary holding. We do not think that this is so. That case involved a diversion of the natural flow of the Platte River into the watersheds of the Republican and Blue Rivers. The taking of the water there involved would damage the rights of lower appropriators on a river already over-appropriated. In the instant case, M. U. D. is a riparian landowner. No water is taken directly from the river. There are no appropriators or riparian owners who are injured by the taking between the well field and the mouth of the Platte River some 5 miles east. In any event, the Osterman case was decided on a statute first enacted in 1889 which prohibited transportation of water beyond the watershed. There is authority that one not damaged cannot raise the question of a diversion of ground water beyond the watershed. But we choose to decide the question on the ground of reasonable use and all the factors that enter into such a consideration, including the reasonableness of a watershed diversion, thus preserving the right of the Legislature, unimpaired, to determine the policy of the state as to underground waters and the rights of persons in their use. Under the record in this case and the applications of the declared law in this case, we can find no basis for holding the diversion from

the well field to be unlawful. Under the evidence in this case the transwatershed diversion was reasonable, for a public purpose, beneficial, not against public policy, and in the public interest.

The presumption of constitutionality prevails under the record in this case. Under the evidence a finding that appropriators and riparian landowners will sustain no damage by the withdrawal of 60,000,000 gallons of underground waters at the site of the well field is sustained by the record. The evidence also supports the finding of the Director of Water Resources that, under the circumstances shown, the withdrawal of such water is in the public interest. The objectors failed to show any damage resulting from the pumping of the water from the well field in the quantity applied for, their evidence resting solely upon surmise and speculation. Under these circumstances and the law as we have found it to be, the order of the Director of Water Resources granting the application must be sustained.

AFFIRMED.

SPENCER, J., dissenting.

There are several reasons why I cannot agree with the majority opinion. In my judgment, the act in question is clearly unconstitutional. Legislative power is vested in the director. Section 46-642, R. S. Supp., 1963, authorizes the director to grant permits without limitation. Nowhere in the act is there any criteria given to control the rulings or actions of the director.

I do not agree that the appellants have not shown a sufficient present interest to raise the issue of constitutionality. The assistant director of the conservation and survey division of the University of Nebraska, who testified for appellee, stated that in his judgment the appellants would not be affected by the appropriation. He did admit, however, that there would be an effect on the surface water that flowed down the stream, and the testimony of appellants is to the effect that the level of their lakes is dependent upon the level of the river. The

majority opinion fixes this lowering of the level of the river at not to exceed 1.1 inches. If this were true, the effect would be minimal.

There is evidence in the record that the operation of the well on Cedar Island, which was one of the four test wells put down by the appellee, lowered the level of a lake located midway between the M. U. D. site and the Merritt property 4 feet while it was in operation. Appellee's evidence would also indicate that in periods of low flow, the appropriation might be more than one-third of the flow of the river. The testimony of its expert was that 60 million gallons a day represented 38.7 percent of the lowest recorded flow. On the present record, I feel that appellants have a sufficient interest to raise the question of the constitutionality of the statute.

I also observe that the expert referred to above testified that although his opinion was that the appellants would not be affected, he could only be sure that this would be true by a period of observation after the M. U. D. wells became operative. It is apparent from the record that in determining the adequacy of the acquifer, M. U. D. was interested solely in the adequacy of the water for its own purpose and was not concerned with the effect on lower riparians.

Section 46-635, R. S. Supp., 1963, defines ground water as follows: "Ground water is that water which occurs or moves, seeps, filters, or percolates through the ground under the surface of the land."

By its expressed mandate, the act is applicable only to ground water. It would appear to me that we ignore the obvious when we describe the water involved herein as ground water and say no water is taken directly from the river. The testimony is undisputed that the waters of the Platte River are to be induced to move toward the appellee's well field under artificial gradient. Surface water does not become ground water by an act of an appropriator. As is well said in III Farnham, Waters and Water Rights, § 940, p. 2722: "The fact that the source

of a running stream is percolating water does not take the stream itself out of the rules applicable to other running water. And, therefore, the water cannot be diverted from its course. And what cannot be done directly cannot be done indirectly; so that, after the water has reached the stream, it cannot be diverted by sinking wells so close to the stream that the water is drawn from it by percolation." The acquifer as such does not have the storage capacity to furnish 60 million gallons of water a day. Fifty-six million gallons of water a day will come from the Platte River, and the balance of 4 million from the acquifer. Further, the testimony is undisputed that the surface flow of the river lies directly on the underground acquifer. Eighteen of appellee's 35 wells are to be placed on an island in the river. The most that can be said is that we are dealing here with the subflow of the Platte River which, from all the law I have found, should be treated as the river itself rather than as percolating or ground water.

I find some difficulty in understanding why the principles enunciated in Osterman v. Central Nebraska Public Power & Irr. Dist., 131 Neb. 356, 268 N. W. 334, are not applicable in this case. We are dealing substantially with surface water and riparians. In my judgment, the distinction drawn by the majority opinion is a distinction without a difference.

There is an inference in the opinion that even if the act were unconstitutional, appellee could still divert the water. There is no merit to the inference. As I view the law, in the absence of statute such act would amount to an unlawful diversion of waters from one watershed to another. I disagree with the statement in the opinion, without the citation of authority, that at common law a riparian in a like situation could transport the water wherever he chose. He could not do so if his well was so close to a stream or lake that he lowered the level of that body by doing so. See Grand Junction Canal Co. v. Shugar, 6 Chancery Appeals 483, in which

Lord Hatherley stated the rule as follows: "Although a landowner will not in general be restrained from drawing off the subterranean waters in the adjoining land, yet he will be restrained if, in so doing, he draws off the water flowing in a defined surface channel through the adjoining land."

To the same effect, see Aetna Mills v. Brookline, 127 Mass. 69, one of the early American cases on percolating waters, which follows the English rule. This was the law applicable at the time the Legislature in 1866 adopted the act referred to in the majority opinion.

I am in full accord with the doctrine of reasonable use. So vital a resource as water should not be permitted to go to waste. In our present society, reasonable use for a beneficial purpose without waste is a necessity. I only insist that the law be observed and the rights of all parties involved be protected. In my view, neither the Legislature nor the courts have the power to abolish rights of riparian proprietors which have become vested, except as such rights be taken or impaired for a public use in an exercise of the powers of eminent domain for which compensation must be made for the injuries sustained. See Crawford Co. v. Hathaway, 60 Neb. 754, 84 N. W. 271.