In re Complaints of Cornhusker Public Power District.

Cornhusker Public Power District, appellant and cross-appellee, v. Loup River Public Power District et al., appellees and cross-appellants.

172 N. W. 2d 235

Filed November 21, 1969. No. 37261.

Healey & Healey and Dennis D. Burchard, for appellant.

Schmid, Ford, Snow, Green & Mooney and Wilson, Barlow & Watson, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

CARTER, J.

This is a proceeding before the Nebraska Power Review Board brought by the Cornhusker Public Power District against the Loup River Public Power District and Consumers Public Power District under sections 70-1001 to 70-1020, R. R. S. 1943, alleging that the latter were violating the service area agreement made by the parties and unlawfully serving two industrial customers of the Cornhusker Public Power District. The basis of the two complaints was denied by the defendants. Defendants also filed a cross-application seeking a modification of Consumers Public Power District's service area agreement by adding thereto a strip of land referred to in the record as the corridor. Cornhusker by answer denied any right to modify the service areas of the parties. The complaints were consolidated for trial and a

hearing had before the Power Review Board. The board by a divided vote dismissed the complaints and sustained in part the application for the service area modification. The complainant has appealed.

For convenience we shall refer to the Cornhusker Public Power District as Cornhusker; Consumers Public Power District as Consumers; Loup River Public Power District as Loup; the Nebraska Power Review Board as the board; the Butler County Rural Public Power District as Butler; the Douglas-Lomason Company as Douglas-Lomason; the Kosch Manufacturing Company as Kosch; the Behlen Manufacturing Company as Behlen; the Champlin Oil Company as Champlin; and the Moorman Manufacturing Company as Moorman.

On May 10, 1965, pursuant to the provisions of section 70-1002, R. R. S. 1943, Cornhusker and Consumers entered into a service area agreement fixing Consumers' service area in the immediate territory as the territory within the corporate limits of the cities of Columbus and Richland, and the customers being served by it outside of such territory. The service area of Cornhusker, so far as it is here involved, included the territory outside of Columbus and Richland excepting customers already being served by Consumers in the area. Such service areas were subject to modification by mutual agreement with the approval of the board or by the board after notice and hearing. It was further provided that neither party, except as mutually agreed, should offer or provide electric service to additional ultimate users in the other party's service area or construct or extend any new line into the service area of another supplier for the purpose of furnishing service to ultimate users therein without first applying for and receiving the approval of the board. In order to eliminate conflicts, duplications, and competition between the parties, it was agreed, so far as applicable here, that where electric lines and facilities crossed or were located in the Cornhusker service area electrical service should not

be extended by Consumers without first obtaining the consent of Cornhusker and the approval of the board or on order of the board after application, notice, and hearing by the board. It was further provided that in the event a load or customer should develop which was closer to an existing electric line of Consumers in Cornhusker's service area, neither Consumers nor Cornhusker should offer electrical service to supply the same without first obtaining the consent of the other party and the approval of the board or by an application to the board approved after notice and hearing. This agreement was approved by the board on May 26, 1965.

On April 11, 1967, Consumers and Loup entered into a realignment agreement by which Loup became entitled to the service area rights of Consumers in the controversial area in consideration for the transfer of utility properties outside the involved service area. This agreement was never approved by the board as required by section 70-1002, R. R. S. 1943. Whether or not the claimed rights of defendants were those of Consumers or Loup seem of little consequence here since both are parties to the action and the claimed rights of Loup cannot exceed those obtained by Consumers.

Material to the issues in this case is an area referred to as the corridor. The corridor is approximately 4½ miles long from east to west and about 1½ miles wide from north to south. The east boundary is the west city limits of Richland and the west boundary is the east city limits of Columbus. The corridor is within the service area of Cornhusker, but Consumers has electric lines and customers in the area specifically shown on the map attached to the service area agreement. Approximately 2 miles east of Columbus, a tail race from Lake Babcock to the Platte River crosses the corridor from north to south. Paralleling the tail race is a 34.5 kv electric line formerly belonging to Butler but now belonging to Cornhusker. Adjoining the tail race on the west is a 400-acre tract of land known as Loup's indus-

trial site. This site is within the Cornhusker service area and gives rise to the service loads in controversy here.

The evidence shows that in the spring of 1965, Douglas-Lomason, a national auto parts manufacturer, was looking for a new plant location. This company was encouraged by the chamber of commerce of Columbus, with the assistance of Consumers and Loup who had personnel on the chamber's negotiating committee, to locate its plant in Columbus. Douglas-Lomason acquired a plant site in the Loup industrial site and negotiated with Consumers for electrical power service. The evidence is that the negotiations for the plant location were necessarily kept secret to protect Douglas-Lomason during the initial stages of its new operation. Cornhusker had no information of the plant location until it became publicly known. Cornhusker began furnishing temporary construction power to the building contractor on May 12, 1965, and was soon informed that arrangements for permanent power supply had been made with Consumers. On or about May 10, 1965, Consumers sought a waiver of Cornhusker's service area rights. It was explained that it was essential that prompt service be provided in view of Douglas-Lomason's contractual commitments. Cornhusker refused to waive its rights but agreed, in view of the circumstances and the civic interest of both Consumers and Cornhusker, to permit Consumers to supply the power until the board could decide the disputed rights of the parties. Consumers proceeded to furnish the power and the present proceeding is an appeal from the board's decision on the issue reserved by the agreement of the parties.

It is the contention of Consumers that Cornhusker did not have the equipment, particularly transformers, to build the line to Douglas-Lomason in May of 1965. This Cornhusker admits. Consumers, on the other hand, had such transformers. Consumers points out that it served one industrial plant, Champlin, east of the tail race by

2 miles of 34.5 kv electric line. This electric line tapped the Butler 34.5 kv electric line. It also served the Behlen plant by likewise tapping the Butler line. Both of these plants are loads properly served by Consumers under its area service agreement with Cornhusker. Other than the Butler 34.5 kv electric line, Consumers had the closest lines to the Douglas-Lomason plant. But it must be borne in mind that all of these industrial plants were served by the Butler line which Cornhusker could use by an arrangement with Butler and which it subsequently purchased. In the fall of 1966, the Moorman Feed Company constructed a plant a short distance north of Consumers' 34.5 kv electric line serving Champlin. Cornhusker had no such line close by and it waived its area service rights and permitted Consumers to serve this load. We fail to see the materiality of this to the issue before us.

In June 1967, Kosch sought and purchased a new site in Loup's industrial site for the purpose of constructing a new building. The selected location was close to U.S. Highway No. 30 and to railroad facilities. Loup apparently conditioned the sale of the ground for the plant on the use of electrical power to be furnished by Loup although it was within Cornhusker's service area. The site was a short distance north of the Douglas-Lomason plant, both being west of the Butler line. Loup was operating all Consumers' properties in the area under its realignment agreement with Consumers. No waiver agreement being reached with Cornhusker, Loup proceeded to provide electric power to Kosch pending a decision by the board.

Much was said in the evidence concerning the ability of the parties to provide adequate service, not only under existing conditions, but in the area of growth and expansion as well. Consumers and Loup argue that the larger facility with a greater inventory of equipment is an element of great import in determining this question. But we have found no evidence that Cornhusker

could not serve Douglas-Lomason and Kosch as well as Consumers or Loup. The power came from the same source and over the same powerlines, and we fail to see where size alone is a controlling factor. It is not claimed that Cornhusker is not adequately staffed or that its operations would be any less efficient than those of Consumers or Loup. It is true, of course, that a larger inventory of equipment might be timesaving in some instances, but in situations such as we have here where one party has notice and an opportunity to obtain necessary equipment during a period which is not available to the other, a distinct advantage exists in favor of the one having advance knowledge of the power requirements of the customer.

Consumers-Loup contend that Douglas-Lomason was their customer before the service area agreement was entered into. If it was, it should have been shown as such a customer when the service area agreement was entered into which it was not. As to Kosch, it is contended that Loup's plan to serve Kosch by tapping the Behlen substation and building a line west across the tail race to Kosch at an estimated expense of $4,600 is more economical than the proposal of Cornhusker to tap the Douglas-Lomason substation and go north to the Kosch plant at an expense of $13,000. There is evidence in the record that in the long run the construction of the line from the Douglas-Lomason plant to Kosch is the more economical for the supplier but not the user since the evidence also shows the Cornhusker user-rate charged is identical with that of Consumers-Loup.

It is fundamental that where it appears that the Nebraska Power Review Board has complied with the requirements of the controlling statutes in exercising the powers granted to it by legislative authority, and the evidence is sufficient to support its findings of fact, this court may not substitute its judgment for that of the board, and the action of the board will be sustained. City of Auburn v. Eastern Nebraska Public Power Dist.,

179 Neb. 439, 138 N. W. 2d 629; City of Schuyler v. Cornhusker P. P. Dist., 181 Neb. 704, 150 N. W. 2d 588.

The public policy of the state in enacting sections 70-1001 to 70-1020, R. R. S. 1943, is stated in the first section of the act to be as follows: "In order to provide the citizens of the state with adequate electric service at as low overall cost as possible, consistent with sound business practices, it is the policy of this state to avoid and eliminate conflict and competition between public power districts, * * * to avoid and eliminate the duplication of facilities and resources which result therefrom, and to facilitate the settlement of rate disputes between suppliers of electricity." By section 70-1011, R. R. S. 1943, it is provided in part: "Except by agreement of the suppliers involved, no supplier shall offer electric service to additional ultimate users outside its service area * * * without first applying to the board and receiving approval thereof, after due notice and hearing under rules and regulations of the board. Such approval shall be granted only if the board finds that the customer or customers proposed to be served cannot or will not be furnished adequate electric service by the supplier in whose service area the customer is located, or that the provision thereof by such supplier would involve wasteful and unwarranted duplication of facilities." In approving the service area agreement entered into by the parties, the board was obliged to follow the guidelines set out in section 70-1007, R. R. S. 1943. The board at that time found in effect that (1) Cornhusker was the supplier best able to supply the load required; (2) it was the most logical future supplier of the area; (3) determined the desires of Cornhusker with respect to loads and service areas it wished to serve; (4) determined that Cornhusker had the ability to provide service at costs comparable to other suppliers in the service area; and (5) that Cornhusker had the ability to cope with the problems of expanding loads and increased costs. In examining the evidence we find nothing to in-

dicate that these findings are not as valid now as they were at the time the service area agreement was entered into. We have not overlooked the fact that if the material evidence is in conflict we will not substitute our judgment for that of the board. But where there is no competent evidence to sustain the elements necessary to warrant an invasion of the area service rights of a supplier, an order of the board permitting it is arbitrary and in conflict with the public policy of the applicable statutes.

Consumers-Loup filed an application with the board for a modification of its existing retail service area by adding thereto the area heretofore referred to as the corridor. The board sustained the application as to the 400-acre tract described as the Loup industrial site and denied it as to the remainder of the territory described as the corridor. Cornhusker appealed from the grant of the application as it applied to the 400-acre tract and Consumers-Loup cross-appealed from the denial of the application as it applied to the balance of the territory in the corridor. The evidence sustains the decision of the board insofar as it denied the application of Consumers-Loup. As to the 400 acres which the board attached to the retail service area of Consumers-Loup, the correctness of the order of the board is controlled by the evidence, or want thereof, applicable to Cornhusker's right to serve Douglas-Lomason and Kosch. We can see no more reason for Consumers-Loup to be permitted to serve loads on the 400-acre tract than to serve Douglas-Lomason and Kosch. The evidence will not sustain a finding that Consumers-Loup is better qualified to serve the 400 acres than Cornhusker because of its larger inventory of equipment, or that it is the logical future supplier of the area, or that the cost of service would be greater, or that it is better able to cope with expanding loads and increased costs.

If Consumers-Loup can, under such circumstances, encroach on the service rights of Cornhusker and take the

most desirable loads or customers, the area service agreement becomes a shambles and the public policy of the statute is defeated. Area service contracts must be respected in the furtherance of the intent of the statute unless and until the supplier is unable to provide the service in accordance with the guidelines set out in section 70-1007, R. R. S. 1943, which affords the basis for the grant of a service area in the first instance.

We conclude that the board's order dismissing the complaints against Consumers-Loup is not supported by the evidence. We hold further that the order of the board sustaining the application for a modification of the area service agreement as to any part of the corridor is not sustained by evidence and that such order is arbitrary and unreasonable. For the foregoing reasons, the orders of the board complained of are reversed.

REVERSED.