GEORGE W. OLSON ET AL., APPELLANTS, V. CITY OF WAHOO, APPELLEE.

FILED MAY 5, 1933. No. 28533.

*Good, Good & Kirkpatrick* and *E. S. Schiefelbein*, for appellants.

*Hendricks & Kokjer, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY and PAINE, JJ.

PAINE, J.

This is an action in equity, brought against the city of Wahoo, upon the charge that the city's new pumping plant has exhausted the water at the bottom of plaintiffs' gravel pit and made it worthless. Plaintiffs pray that the city be restrained from operating its pumps to a greater capacity than 300 gallons a minute, and that plaintiffs have judgment for damages in the sum of $39,271.50. The trial court determined that the plaintiffs had failed to make out a case, and dismissed the action.

As the trial court determined the controversy largely as a question of fact, it is necessary to make a rather full statement of the case. The petition sets out that the plaintiffs are the owners of a tract of land containing 13.56 acres. A portion of this tract is on a small hill, and is underlaid with a valuable bed of gravel. Deep excavations have been made in said gravel pit, reaching to the water line, and pumping machinery, installed upon a raft or float, with a sluicing device, washes the gravel and separates it into grades for commercial purposes. This gravel pit is located upon a part of a large geological formation, known as Todd Valley, which in previous geologic eras constituted a former bed and channel of the Platte river from the village of Morse Bluff to a point near Ashland, Nebraska. The said Todd Valley consists of a great gravel bed, filled with water, which comes to an average depth of 12 feet below the surface of the ground, the gravel bed reaching to a depth of from 70 to 100 feet below the surface of the ground. The excavation in plaintiffs' gravel pit reached below the water level of Todd Valley. The city pumping plant, installed in 1910 by the city of Wahoo, was not of sufficient capacity, and in April, 1930, the city of Wahoo constructed a new well, approximately 80 feet deep and 10 feet in diameter, and installed a steam turbine engine generator and condenser, with a capacity of 900 gallons a minute, half of said water pumped being used to cool the turbine engine generator and condenser, and, as a result of said operation, the water has been greatly lowered in said city wells. The lowering of the water table extends for a distance of more than a mile in every direction from said well, and has lowered the water level in the gravel pit of plaintiffs by more than four feet, thereby practically ruining it, to the great and irreparable injury of the plaintiffs. There is a bed of clay, about 17 feet thick, lying between the bottom of the present excavation and the lower gravel, and it would require large expenditures to reach gravel at a lower point. That the acts of

the city of Wahoo are wholly unlawful, and constitute an unreasonable use of the underground water, and plaintiffs are entitled to an injunction restraining the defendant from taking said water in such unreasonable quantities, to the damage of the plaintiffs. That the acts of the city of Wahoo constitute a deprivation of the plaintiffs of their property without due process of law, in violation of the Constitution of the United States, and of section 3, art. I of the Constitution of the state of Nebraska, and constitute the taking and damaging of plaintiffs' property without just compensation, as forbidden by section 21, art. I of the Constitution of Nebraska. That the damage to the real estate of the plaintiffs is. $30,000, loss of production $5,000, which, with additional items, make the total amount set out above.

The defendant in its answer admits certain facts of the petition, and alleges that it has been the owner of the land from which the water is taken for more than 20 years; that it has established said pumping plant at large expense; that all of the water taken therefrom is used by the defendant and its inhabitants; that, if the water level on the lands of plaintiffs had receded at the time the petition was filed, August 23, 1930, it is because of the extremely dry weather of the year 1930, and other causes, and is not due to any action of the defendant city; that, when the plaintiffs purchased the land on which the gravel pit is located, they knew the water plant of the city had been located where it is now for many years prior thereto, and was the exclusive source of the city's water supply, and defendant prays that the action of plaintiffs be dismissed.

Among the witnesses called to support the plaintiffs' allegations, the principal one was Professor A. L. Lugn, the holder of several degrees, assistant professor of geology at the University of Nebraska, who has been working for the past three years on ground-water hydrology, under the direction of Dr. George Condra, particularly with reference to the Platte river and its underflow, which

investigations he has conducted from southeast of Wahoo to the Wyoming line. He described Todd Valley as a channel through which the Platte river once flowed, and that it varies from five to eight miles in width, and is some 35 miles in length, and at several places is known to have beds of gravel and sand to the depth of 100 feet; that this gravel bed is covered with soil, and receives its water from local rainfall and from a leakage from the Platte river north of Cedar Bluffs, where the present Platte river is in direct contact with the sand and gravel of the old Todd Valley, making an underflow from the Platte river down through this valley. He testified that the plaintiffs' gravel pit, at the northeast corner of the city of Wahoo, was right on the border or edge of the Todd Valley, but he had not been able to determine whether it properly belongs to the Todd Valley sand and gravel, or to some older geological formation, but that the water level was such that it usually conformed to the water level in the Todd Valley. In June, 1929, he made observations of the elevation of water at many points in this vicinity. The water level in the Olson gravel pit was at that time 1,169 to 1,170 feet above the sea level, and in August, 1930, the water level at the city pumping plant was 1,151, and the water level at the Olson gravel pit on August 3, 1930, was 1,166, making a drop of three to four feet in the year intervening. Professor Lugn concluded that the fall in the water level at the gravel pit was not due to general conditions, but was due to local conditions; in other words, to the new city pumping plant. He is corroborated in this by the fact that the water level in other wells in the vicinity had also gone down, and by the time of trial in July, 1931, the water level in the Olson gravel pit had declined between six and seven feet from the first observation in June, 1929. The evidence of a number of residents was taken, which showed that the water had gradually failed in wells or pumps. The city sunk a number of test wells, test well No. 1 being 2,300 feet away from the turbine well in the

general direction of the Olson gravel pit, and in this well the water rose 2 inches between June 4 and June 6, when the large turbine was not in operation, and in test well No. 2, 1,500 feet away from the city turbine well, the water level at the same time rose 4 1/3 inches, but declined again when the pump began operation. Test well No. 3, 870 feet away from the city turbine well, rose 4 2/3 inches during the two days when the large pump was not in operation, and test wells located on the other side of the city pumping plant also exhibited similar changes. Several farmers were called as witnesses, and testified that water levels had gone down in the summer of 1930. When Professor Lugn was asked the reason for the lowering of the water levels in the plaintiffs' gravel pit, he made answer: "As far as there is any evidence the cause of the lowering in the sand pit is local, and there is no other local cause adequate to account for the lowering other than the pumping, so I would conclude that the pumping is responsible for that lowering of the water in the sand pit." His evidence was supported by exhibits introduced.

Clark E. Mickey, professor of civil engineering in the University of Nebraska, also testified in favor of the plaintiffs. The direct evidence of the plaintiffs makes up about 382 pages of the 810 pages of the bill of exceptions.

The defendant contested every allegation tending to show that the city pump was in the slightest degree the cause of the lowering of the water in the plaintiffs' gravel pit.

Mr. E. W. Bennison, a graduate of the engineering department of the University of Nebraska in 1904, and who studied geology under Dr. Barbour while at the university, was one of the technical experts who supported the contentions of the defendant. He was engaged in engineering for five years with the Burlington, three years with the Iowa state highway commission, for two years with the United States army, was three years city engineer of Grand Island, and for the last seven years has

been the engineer of the Kelly Well Company of Grand Island, during which time he has developed water supplies in all parts of the United States east of the Rocky Mountains. He has developed extensive water supplies for the Bayer Aspirin Company, the Seiberling Rubber Company, the Pittsburg Plate Glass Company, the Fleishmann Yeast Company, the American Tobacco Company, Libby, McNeill & Libby, and many other large industrial concerns. He has delivered lectures and contributed articles to various scientific magazines upon the subject of water supply. Many exhibits were introduced to support his evidence. It was shown that, while the turbine pump was in full operation, it would draw down the water line in the 80-foot well 9.3 feet from the static or normal water level, and that this lower end of the cone rose sharply in the test well 50 feet away; and other test wells at a greater distance, supervised by Mr. Bennison, showed decreasing effect upon the water level at greater distances from the well. Mr. Bennison, after a careful study of the entire situation, gave it as his opinion that there could be no possible influence on the water level in the Olson gravel pit by the pumping of the city well, 3,400 feet away.

Professor E. E. Brackett, of the University of Nebraska, also made actual experiments to determine the shape of the cone of the depression of the water line reaching out from the well, and explained specific tests at the Hugh Brown farm southwest of Gibbon, Nebraska, in a soil formation which tallied with that of the Todd Valley formation, and said that, when water was being pumped in this well at the rate of 1,020 gallons a minute, at the end of 14 hours' pumping there was only a lowering of about a foot in a test well 200 feet away, and he testified positively that the area of influence did not extend more than 1,000 feet away from the city pump at Wahoo, and that it could not extend a distance of 3,400 feet.

Mr. G. L. Weishaar, a well contractor, of 22 years' experience in eight states, who resides at Scott City, Kansas,

and who constructed this well for the city of Wahoo, testified there would be no influence upon the water level at a distance of 3,400 feet in any direction from this well, even though it was pumping 900 to 1,000 gallons a minute continuously.

Mr. A. C. Kirkwood, an engineer, who had graduated at the Stanford University and at the Massachusetts Institute of Technology, and who is an expert of the Burns & McDonnell Engineering Company, of Kansas City, Missouri, testified that the area of influence would not exceed 1,000 feet. He was asked to make a computation, by assuming that the great body of water in the gravel, of 33 1/3 per cent. porosity, was not replenished from any source, and that the center of this cone of water had a depression at the city pump, when it was drawing out 900 gallons a minute, of 9.3 feet below the water level, how much water would have to be pumped out to lower the level of water 3,400 feet away, at the Olson gravel pit, four feet. His answer was that, if there was no replenishment from any source, 115,300,000 cubic feet of water, or 865,000,000 gallons of water, would have to be pumped out, and that this would require a constant pumping, at full capacity, night and day, for one year and ten months. If this estimate is true, then it was impossible to lower the level at the gravel pit by the city pump, which was only installed April 12, 1930, a distance of four feet before the date the petition was filed, August 23, 1930; or, to put the converse of the proposition, that, to lower the level, as indicated, in the 134 days between those dates, the city pump would have had to pump out 4,480 gallons a minute every hour, according to Mr. H. S. Nixon, an Omaha engineer, and its capacity was but 900 gallons a minute.

The Olson gravel pit lies at the west edge of the Todd Valley, and Professor Lugn testified that he had not been able to determine whether it properly belongs to the Todd Valley sand and gravel, or to something older geologically. He said that part of this formation on the west edge of

Todd Valley consisted of sand, clay, and gravel, heterogeneously mixed together, so that in places it constituted a watertight material, and without making drillings it was impossible to tell whether these various beds of clay ran out into Todd Valley or not. He also testified that he had made no tests of the material between the Olson pit and the city pumping plant to determine the porosity of the materials between these two points. Testimony was given by others to show that the continual pumping in the gravel pit, during the years it has been used, and washing the gravel free of the clay, had put fine silt back into the bottom of the gravel pit, and might in places make an impervious bed, which in itself would interfere with the water reaching the same level as in the Todd Valley. There was evidence to show that the year 1930, when the petition was filed, was a dry year, and that wells of farms in that locality had gone dry, and that the pumps in city water plants in several towns in the Platte valley had had to be lowered that season because of the lower water level.

It is contended by the plaintiffs that the city has destroyed their gravel pit, but it is set out by the petition of the plaintiffs that it would cost the plaintiffs at least $1,000 to lower the bottom of their pit through a stratum of clay which is 10 to 17 feet thick. It is evident that below such clay there would be a bed of gravel which would be far under the present water line in Todd Valley, and could be worked successfully, although at some additional expense because of the greater depth.

The only grounds for a new trial presented were: That the judgment was contrary to the law and to the evidence, and was not sustained by sufficient evidence, and because of errors duly excepted to during the trial.

In *Meng v. Coffee,* 67 Neb. 500, Commissioner Pound, in a very long opinion, held that the common-law rules as to the rights and duties of riparian owners are in force in this state, except as modified by statute, but it has been held that the law in relation to surface waters

is not applicable to subterranean waters. *Beatrice Gas Co. v. Thomas,* 41 Neb. 662, 43 Am. St. Rep. 711. This case involved the pollution of underground water, and Commissioner Irvine, citing from a Kentucky case, said that one must so use his property as not to injure his neighbor, and because the owner had the right to make an appropriation of all the underground water, and thus prevent its use by another, he had no right to poison it, and was liable for damages thereby sustained. He also discusses in this case the fact that the injury might be lessened or avoided by putting down another well, which might be considered in mitigation of the damages.

It is a general rule that the furnishing of water to the inhabitants of a city, for the purpose of health, convenience, and comfort, is a public use. 27 R. C. L. 1402.

In the case at bar, the plaintiffs contend for the American rule on percolating waters, while the defendant insists upon the common-law rule, and it is admitted that this court has not yet adopted either view. A full discussion of these two rules, together with the citations from the states following each rule, will be found in the note of 181 pages in 55 A. L. R. beginning on page 1385. There is a distinction made between underground waters flowing in known and well-defined channels, such as the water flowing in the gravel bed in Todd Valley, and also underground waters, the channels of which are undefined and unknown, and it is held that the principles of law governing the former are not applicable to the latter. 55 A. L. R. 1444. The defendant in the case at bar, by its evidence, throws much doubt on the question whether the water under the plaintiffs' gravel pit is connected directly with the underground stream of water flowing in the Todd Valley. The question of the rights in percolating waters is comparatively modern. The first case arising in England, in 1840, *Hammond v. Hall,* 10 Sim. 551, 59 Eng. Reprint, 729, did not definitely decide the question, but, in 1843, Tindale, C. J., in *Acton v. Blundell,* 12 M.

& W. (Eng.) 324, established the English, or common-law, doctrine. This rule is that percolating waters are regarded as belonging to the owner of the freehold, like rocks, soil, minerals, and, in the absence of malice, the owner may appropriate such waters while they are upon his premises, regardless of the fact that such use cuts off the flow of such waters to adjoining land, and in the long note from A. L. R., *supra*, decisions are cited from 29 states, the District of Columbia, England, and Ireland, showing the adoption of this common-law rule.

The American rule is that the owner of land is entitled to appropriate subterranean waters found under his land, but he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land which he owns, especially if such use is injurious to others who have substantial rights to the waters, and if the natural underground supply is insufficient for all owners, each is entitled to a reasonable proportion of the whole, and while a lesser number of states have adopted this rule, it is, in our opinion, supported by the better reasoning.

For further discussion of the two rules, we cite the following opinions: *Meeker v. City of East Orange,* 77 N. J. Law, 623, 25 L. R. A. n. s. 465; *Erickson v. Crookston Waterworks, P. & L. Co.,* 100 Minn. 481, 8 L. R. A. n. s. 1250, 10 Ann. Cas. 843; *Bassett v. Salisbury Mfg. Co.,* 43 N. H. 569, 82 Am. Dec. 179 (decided in June, 1862, in which decision the English rule was first questioned in the United States) ; *Rouse v. City of Kinston,* 188 N. Car. 1, 35 A. L. R. 1203; *Gagnon v. French Lick Springs Hotel Co.,* 163 Ind. 687, 68 L. R. A. 175; *Pure Springs Water Supply Co. v. Town of Olney Springs,* 87 Colo. 420; *Cohen v. La Canada Land and Water Co.,* 151 Cal. 680, 11 L. R. A. n. s. 752; *Clinchfield Coal Corporation v. Compton,* 148 Va. 437, 55 A. L. R. 1376.

In the trial of this case, Judge Landis made a personal examination of the city pumping plant, of some or all of the test wells, and of the gravel pit, and this court has held that, where the oral evidence on the material issues

is conflicting, this court will consider the personal examination made of the physical facts by the trial judge, as well as his observance of the witnesses, and that he must have accepted one version of the facts rather than the opposite. *City of Wilber v. Bednar,* 123 Neb. 324; *State v. Delaware-Hickman Ditch Co.,* 114 Neb. 806.

In the opinion filed by the trial judge in the case at bar, he states that the plaintiffs have proved that the water level in their gravel pit has been lowered, but that they have failed to prove that the defendant caused such lowering. After stating that he visited the gravel pit, he states that one of the important elements in determining the flow of the underground water in the Todd Valley is the porosity of the material through which it flows, and that no evidence was offered as to the porosity of the materials as it affects the water level in the gravel pit, and that the expert evidence offered by the plaintiffs is indefinite, in that it locates a probable cause only of the lowering of the water level in the gravel pit, and adds that, if the defendant had rested at the close of the plaintiffs' testimony, he would have dismissed the action because of failure of proof. The trial court then adds that the expert evidence offered by the defendant shows that there are many causes which might have caused the lowering of the water level in the gravel pit, and that it is quite improbable that the pumping done by the city, 3,400 feet away, was the proximate cause of plaintiffs' damage.

This court finds that the evidence indicates that a deepening of the bottom of the gravel pit through the clay bed now reached, of 10 to 17 feet in thickness, would secure an abundance of water for further operations in the gravel below the clay bed, if, as the plaintiffs contend, the water in the gravel pit is connected directly with the percolating water in Todd Valley, for this water is inexhaustible, and one of the experts estimated that the flow or volume of water passing through the gravel of the Todd Valley was more than 10,000,000 gallons a day,

as it has a direct connection with the present bed of the Platte river at one point.

Upon a consideration of all of the evidence, we find no error in the judgment entered by the trial court, and the same is hereby

AFFIRMED.