# SPORHASE ET AL. v. NEBRASKA EX REL. DOUGLAS, ATTORNEY GENERAL

No. 81–613.   Argued March 30, 1982—Decided July 2, 1982

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 961.

*Richard A. Dudden* argued the cause and filed a brief for appellants.

*G. Roderic Anderson,* Assistant Attorney General of Nebraska, argued the cause for appellee. With him on the brief was *Paul L. Douglas,* Attorney General, and *Steven C. Smith,* Special Assistant Attorney General.*

*Briefs of *amici curiae* urging affirmance were filed by *Jeff Bingaman,* Attorney General, and *Richard A. Simms, Jeffrey L. Fornaciari,* and *Stephen D. Dillon,* Special Assistant Attorneys General, for the State of New

JUSTICE STEVENS delivered the opinion of the Court.

Appellants challenge the constitutionality of a Nebraska statutory restriction on the withdrawal of ground water from any well within Nebraska intended for use in an adjoining State. The challenge presents three questions under the Commerce Clause:[1] (1) whether ground water is an article of commerce and therefore subject to congressional regulation; (2) whether the Nebraska restriction on the interstate transfer of ground water imposes an impermissible burden on commerce; and (3) whether Congress has granted the States permission to engage in ground water regulation that otherwise would be impermissible.

---

Mexico; by *John P. Frank* and *William L. Lutz* for the Elephant Butte Irrigation District et al.; by *Jon T. Brown, William B. Bonvillian,* and *Stephen E. Roady* for the National Agricultural Lands Center et al.; and by *Patrick A. Parenteau* for the National Wildlife Federation et al.

Briefs of *amici curiae* were filed for the State of California by *George Deukmejian,* Attorney General, *R. H. Connett,* Assistant Attorney General, and *Roderick Walston* and *Gregory K. Wilkinson,* Deputy Attorneys General; for the State of Colorado et al. by *J. D. MacFarlane,* Attorney General of Colorado, *Richard F. Hennessey,* Deputy Attorney General, *Mary J. Mullarkey,* Solicitor General, and *Dennis M. Montgomery* and *William A. Paddock,* Assistant Attorneys General, *Steven F. Freudenthal,* Attorney General of Wyoming, *Walter Perry,* Senior Assistant Attorney General, and *Lawrance J. Wolfe,* Assistant Attorney General, *Robert T. Stephan,* Attorney General of Kansas, *Mark D. Meierhenry,* Attorney General of South Dakota, *John Ashcroft,* Attorney General of Missouri, *Richard H. Bryan,* Attorney General of Nevada, and *George Campbell,* Deputy Attorney General, *Robert O. Wefald,* Attorney General of North Dakota, and *David L. Wilkinson,* Attorney General of Utah; and for the City of El Paso by *Harry M. Reasoner* and *Charles J. Meyers.*

[1] Article I, § 8, cl. 3, of the United States Constitution provides: "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." For general explanations of Commerce Clause analysis, see, *e. g., Western & Southern Life Insurance Co.* v. *State Board of Equalization,* 451 U. S. 648, 652–653 (1981); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 766–770 (1945).

Appellants jointly own contiguous tracts of land in Chase County, Nebraska, and Phillips County, Colorado. A well physically located on the Nebraska tract pumps ground water for irrigation of both the Nebraska tract and the Colorado tract. Previous owners of the land registered the well with the State of Nebraska in 1971, but neither they nor the present owners applied for the permit required by Neb. Rev. Stat. § 46–613.01 (1978). That section provides:

"Any person, firm, city, village, municipal corporation or any other entity intending to withdraw ground water from any well or pit located in the State of Nebraska and transport it for use in an adjoining state shall apply to the Department of Water Resources for a permit to do so. If the Director of Water Resources finds that the withdrawal of the ground water requested is reasonable, is not contrary to the conservation and use of ground water, and is not otherwise detrimental to the public welfare, he shall grant the permit if the state in which the water is to be used grants reciprocal rights to withdraw and transport ground water from that state for use in the State of Nebraska."

Appellee brought this action to enjoin appellants from transferring the water across the border without a permit.[2] The trial court rejected the defense that the statute imposed an undue burden on interstate commerce and granted the injunction. The Nebraska Supreme Court affirmed. 208 Neb. 703, 305 N. W. 2d 614 (1981). It held that, under Nebraska law, ground water is not "a market item freely transferable for value among private parties, and therefore [is] not an article of commerce." *Id.*, at 705, 305 N. W. 2d, at

---

[2] Because of the reciprocity requirement of § 46–613.01, appellants would not have been granted a permit had they applied for one. Their failure to submit an application therefore does not deprive them of standing to challenge the legality of the reciprocity requirement. Cf. *Larson* v. *Valente*, 456 U. S. 228 (1982).

616.[3]   The Chief Justice, while agreeing that the statutory criteria governing the transfer of water to an adjoining State did not violate the Commerce Clause, dissented on the narrow ground that appellee violated both the Federal and Nebraska Constitutions by attempting "to absolutely prohibit the transfer of water, without regard to its need or availability, based solely upon the acts of another state over which citizens of this state have no control." *Id.*, at 713, 305 N. W. 2d, at 620.

## I

In holding that ground water is not an article of commerce, the Nebraska Supreme Court and appellee cite as controlling precedent *Hudson County Water Co.* v. *McCarter*, 209 U. S. 349 (1908).   In that case a New Jersey statute prohibited the interstate transfer of any surface water located within the State.[4]   The Hudson County Water Co. nevertheless contracted with New York City to supply one of its boroughs with water from the Passaic River in New Jersey.   The State Attorney General sought from the New Jersey courts an injunction against fulfillment of the contract.   Over the water company's objections that the statute impaired the obligation of contract, took property without just compensation, interfered with interstate commerce, denied New York citizens the privileges afforded New Jersey citizens, and denied New York citizens the equal protection of the laws, the injunction was granted.   This Court, in an opinion by Justice Holmes, affirmed.

---

[3] The Nebraska Supreme Court also rejected appellants' equal protection and due process challenges.   Appellants renew those challenges before this Court, but we need not reach these issues in light of our disposition of the Commerce Clause claim.

[4] The Court quoted the statute: " 'It shall be unlawful for any person or corporation to transport or carry, through pipes, conduits, ditches or canals, the waters of any fresh water lake, pond, brook, creek, river or stream of this State into any other State, for use therein.' "   209 U. S., at 353.

Most of the Court's opinion addresses the just compensation claim. Justice Holmes refused to ground the Court's holding, as did the New Jersey state courts,[5] on "the more or less attenuated residuum of title that the State may be said to possess." *Id.*, at 355. For the statute was justified as a regulatory measure that, on balance, did not amount to a taking of property that required just compensation. Putting aside the "problems of irrigation," the State's interest in preserving its waters was well within its police power.[6] That interest was not dependent on any demonstration that the State's water resources were inadequate for present or future use. The State "finds itself in possession of what all admit to be a great public good, and what it has it may keep and give no one a reason for its will." *Id.*, at 357.

Having disposed of the just compensation claim, Justice Holmes turned very briefly to the other constitutional chal-

---

[5] "The Courts below assumed or decided and we shall assume that the defendant represents the rights of a riparian proprietor, and on the other hand, that it represents no special chartered powers that give it greater rights than those. On these assumptions the Court of Errors and Appeals pointed out that a riparian proprietor has no right to divert waters for more than a reasonable distance from the body of the stream or for other than the well-known ordinary uses, and that for any purpose anywhere he is narrowly limited in amount. It went on to infer that his only right in the body of the stream is to have the flow continue, and that there is a residuum of public ownership in the State. It reinforced the State's rights by the State's title to the bed of the stream where flowed by the tide, and concluded from the foregoing and other considerations that, as against the rights of riparian owners merely as such, the State was warranted in prohibiting the acquisition of the title to water on a larger scale." *Id.*, at 354.

[6] "The problems of irrigation have no place here. Leaving them on one side, it appears to us that few public interests are more obvious, indisputable and independent of particular theory than the interest of the public of a State to maintain the rivers that are wholly within it substantially undiminished, except by such drafts upon them as the guardian of the public welfare may permit for the purpose of turning them to a more perfect use." *Id.*, at 356.

lenges. In one paragraph, he rejected the Contract Clause claim. In the remaining paragraph of the opinion, he rejected all the other defenses. His treatment of the Commerce Clause challenge consists of three sentences: "A man cannot acquire a right to property by his desire to use it in commerce among the States. Neither can he enlarge his otherwise limited and qualified right to the same end. The case is covered in this respect by *Geer* v. *Connecticut*, 161 U. S. 519 [(1896)]." *Ibid.*

While appellee relies upon *Hudson County*, appellants rest on our summary affirmance of a three-judge District Court judgment in *City of Altus* v. *Carr*, 255 F. Supp. 828 (WD Tex.), summarily aff'd, 385 U. S. 35 (1966). The city of Altus is located near the southern border of Oklahoma. Large population increases rendered inadequate its source of municipal water. It consequently obtained from the owners of land in an adjoining Texas county the contractual right to pump the ground water underlying that land and to transport it across the border. The Texas Legislature thereafter enacted a statute that forbade the interstate exportation of ground water without the approval of that body.[7] The city filed suit in Federal District Court, claiming that the statute violated the Commerce Clause.

The city relied upon *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229 (1911), which invalidated an Oklahoma statute that prevented the interstate transfer of natural gas produced within the State,[8] and *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923), which invalidated a West Virginia statute

---

[7] The District Court quoted the statute: "'No one shall withdraw water from any underground source in this State for use in any other state by drilling a well in Texas and transporting the water outside the boundaries of the State unless the same be specifically authorized by an Act of the Texas Legislature and thereafter as approved by it.'" 255 F. Supp., at 830.

[8] Justice Holmes, the author of the Court's opinion in *Hudson County*, noted his dissent. See 221 U. S., at 262.

that accorded a preference to the citizens of that State in the purchase of natural gas produced therein.[9] The Texas Attorney General defended the statute on two grounds. First, he asserted that its purpose was to conserve and protect the State's water resources by regulating the withdrawal of ground water. The District Court rejected that defense because similar conservation claims had met defeat in *West* v. *Kansas Natural Gas Co.*, *supra*, and *Pennsylvania* v. *West Virginia*, *supra*.[10] Second, the State argued that the statute regulated ground water and that ground water is not an article of commerce, citing *Geer* v. *Connecticut*, 161 U. S. 519 (1896), and *Hudson County Water Co.* v. *McCarter*, 209 U. S. 349 (1908). The court rejected this argument since the statute directly regulated the interstate transportation of

---

[9] Justice Holmes dissented, expressing the view that the Court's decision was inconsistent with *Hudson County.* See 262 U. S., at 603.

[10] The District Court opinion, 255 F. Supp., at 839, included these quotations from the two cases:

"The statute of Oklahoma recognizes [natural gas] to be a subject of intrastate commerce, but seeks to prohibit it from being the subject of interstate commerce, and this is the purpose of its conservation. In other words, the purpose of its conservation is in a sense commercial—the business welfare of the State, as coal might be, or timber. Both of these products might be limited in amount, and the same consideration of the public welfare which would confine gas to the use of the inhabitants of a State would confine them to the inhabitants of the State. If the States have such power a singular situation might result. Pennsylvania might keep its coal, the Northwest its timber, the mining States their minerals. And why may not the products of the field be brought within the principle?" *West* v. *Kansas Natural Gas Co.*, 221 U. S., at 255.

"Another consideration advanced to the same end is that natural gas is a natural product of the State and has become a necessity therein, that the supply is waning and no longer sufficient to satisfy local needs and be used abroad, and that the act is therefore a legitimate measure of conservation in the interest of the people of the State. If the situation be as stated, it affords no ground for the assumption by the State of the power to regulate interstate commerce, which is what the act attempts to do. That power is lodged elsewhere." *Pennsylvania* v. *West Virginia*, 262 U. S., at 598.

water that had been pumped from the ground, and under Texas law such water was an article of commerce. The court then had little difficulty in concluding that the statute imposed an impermissible burden on interstate commerce.[11]

In summarily affirming the District Court in *City of Altus*, we did not necessarily adopt the court's reasoning. Our affirmance indicates only our agreement with the result reached by the District Court. *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 499 (1981). That result is not necessarily inconsistent with the Nebraska Supreme Court's holding in this case. For Texas law differs significantly from Nebraska law regarding the rights of a surface owner to ground water that he has withdrawn. According to the District Court in *City of Altus*, the "rule in Texas was that an owner of land could use all of the percolating water he could capture from the wells on his land for whatever beneficial purposes he needed it, on or off the land, and could likewise sell it to others for use on or off the land and outside the basin where produced, just as he could sell any other species of property." 255 F. Supp., at 833, n. 8. Since ground water, once withdrawn, may be freely bought and sold in States that follow this rule, in those States ground water is appropriately re-

---

[11] "Considering the statute in question only with regard to whether it regulates the transportation and use of water after it has been withdrawn from a well and becomes personal property, such statute constitutes an unreasonable burden upon and interference with interstate commerce. Moreover, on the facts of this case it appear[s] to us that [the Texas statute] does not have for its purpose, nor does it operate to conserve water resources of the State of Texas except in the sense that it does so for her own benefit to the detriment of her sister States as in the case of West v. Kansas Natural Gas Co. In the name of conservation, the statute seeks to prohibit interstate shipments of water while indulging in the substantial discrimination of permitting the unrestricted intrastate production and transportation of water between points within the State, no matter how distant; for example, from Wilbarger County to El Paso County, Texas. Obviously, the statute had little relation to the cause of conservation." 255 F. Supp., at 839–840.

garded as an article of commerce. In Nebraska the surface owner has no comparable interest in ground water. As explained by the Nebraska Supreme Court, "'the owner of land is entitled to appropriate subterranean waters found under his land, but he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land which he owns, especially if such use is injurious to others who have substantial rights to the waters, and if the natural underground supply is insufficient for all owners, each is entitled to a reasonable proportion of the whole.'" 208 Neb., at 705, 305 N. W. 2d, at 617 (quoting *Olson* v. *City of Wahoo*, 124 Neb. 802, 811, 248 N. W. 304, 308 (1933)).

*City of Altus*, however, is inconsistent with *Hudson County*. For in the latter case the Court found *Geer* v. *Connecticut, supra*, to be controlling on the Commerce Clause issue. *Geer*, which sustained a Connecticut ban on the interstate transportation of game birds captured in that State, was premised on the theory that the State owned its wild animals and therefore was free to qualify any ownership interest it might recognize in the persons who capture them. One such restriction is a prohibition against interstate transfer of the captured animals. This theory of public ownership was advanced as a defense in *City of Altus*. The State argued that it owned all subterranean water and therefore could recognize ownership in the surface owner who withdraws the water, but restrict that ownership to use of the water within the State. That theory, upon which the Commerce Clause issue in *Hudson County* was decided, was rejected by the District Court in *City of Altus*.[12] In expressly

---

[12] "This statute, however, seeks to prohibit the production of underground water for the purpose of transporting same in interstate commerce, and has the effect of prohibiting the interstate transportation of such water after it has become personal property. Whether a statute by its phraseology prohibits the interstate transportation of an article of commerce after it has become the personal property of someone as in the Pennsylvania and West cases, or prohibits the withdrawal of such substance where the intent

overruling *Geer* three years ago, this Court traced the demise of the public ownership theory and definitively recast it as " 'but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.' " *Hughes* v. *Oklahoma*, 441 U. S. 322, 334 (1979) (quoting *Toomer* v. *Witsell*, 334 U. S. 385, 402 (1948)). See also *Baldwin* v. *Montana Fish and Game Comm'n*, 436 U. S. 371, 384–387 (1978); *Douglas* v. *Seacoast Products, Inc.*, 431 U. S. 265, 284–285 (1977). In *Hughes* the Court found the State's interests insufficient to sustain a ban on the interstate transfer of natural minnows seined from waters within the State.

Appellee insists, however, that Nebraska water is distinguishable from other natural resources. The surface owner who withdraws Nebraska ground water enjoys a lesser ownership interest in the water than the captor of game birds in Connecticut or minnows in Oklahoma or ground water in Texas, for in *Geer, Hughes*, and *City of Altus* the States permitted intrastate trade in the natural resources once they were captured. Although appellee's greater ownership interest may not be irrelevant to Commerce Clause analysis, it does not absolutely remove Nebraska ground water from such scrutiny. For appellee's argument is still based on the legal fiction of state ownership. The fiction is illustrated by municipal water supply arrangements pursuant to which ground water is withdrawn from rural areas and transferred to urban areas. Such arrangements are permitted in Nebraska, see *Metropolitan Utilities District* v. *Merritt Beach Co.*, 179 Neb. 783, 140 N. W. 2d 626 (1966), but the Nebraska Supreme Court distinguished them on the ground that the

is to transport such in interstate commerce, the result upon interstate commerce is the same. In both situations, the purpose and intent of the statute and the end result thereof is to prohibit the interstate transportation of an article of commerce." *Id.*, at 840.

transferor was only permitted to charge as a price for the water his costs of distribution and not the value of the water itself. 208 Neb., at 708, 305 N. W. 2d, at 618. Unless demand is greater than supply, however, this reasoning does not distinguish minnows, the price of which presumably is derived from the costs of seining and of transporting the catch to market. Even in cases of shortage, in which the seller of the natural resource can demand a price that exceeds his costs, the State's rate structure that requires the price to be cost-justified is economically comparable to price regulation. A State's power to regulate prices or rates has never been thought to depend on public ownership of the controlled commodity. It would be anomalous if federal power to regulate economic transactions in natural resources depended on the characterization of the payment as compensation for distribution services, on the one hand, or as the price of goods, on the other. Cf. *In re Rahrer*, 140 U. S. 545, 558 (1891).

The second asserted distinction is that water, unlike other natural resources, is essential for human survival. Appellee, and the *amici curiae* that are vitally interested in conserving and preserving scarce water resources in the arid Western States, have convincingly demonstrated the desirability of state and local management of ground water.[18]

---

[18] In *California* v. *United States*, 438 U. S. 645, 648 (1978), we explained some of the circumstances that support a general policy of local water management under differing legal systems:

"The very vastness of our territory as a Nation, the different times at which it was acquired and settled, and the varying physiographic and climate regimes which obtain in its different parts have all but necessitated the recognition of legal distinctions corresponding to these differences. Those who first set foot in North America from ships sailing the tidal estuaries of Virginia did not confront the same problems as those who sailed flat boats down the Ohio River in search of new sites to farm. Those who cleared the forests in the old Northwest Territory faced totally different physiographic problems from those who built sod huts on the Great Plains. The final expansion of our Nation in the 19th century into the arid lands beyond the hundredth meridian of longitude, which had been shown on early maps as the 'Great American Desert,' brought the participants in

But the States' interests clearly have an interstate dimension. Although water is indeed essential for human survival, studies indicate that over 80% of our water supplies is used for agricultural purposes.[14] The agricultural markets supplied by irrigated farms are worldwide. They provide the archtypical example of commerce among the several States for which the Framers of our Constitution intended to authorize federal regulation. The multistate character of the Ogallala aquifer—underlying appellants' tracts of land in Colorado and Nebraska, as well as parts of Texas, New Mexico, Oklahoma, and Kansas[15]—confirms the view that there is a significant federal interest in conservation as well as in fair allocation of this diminishing resource. Cf. *Arizona* v. *California*, 373 U. S. 546 (1963).

The Western States' interests, and their asserted superior competence, in conserving and preserving scarce water resources are not irrelevant in the Commerce Clause inquiry. Nor is appellee's claim to public ownership without significance. Like Congress' deference to state water law, see *infra*, at 958–960, these factors inform the determination whether the burdens on commerce imposed by state ground water regulation are reasonable or unreasonable. But appellee's claim that Nebraska ground water is not an article of commerce goes too far: it would not only exempt Nebraska ground water regulation from burden-on-commerce analysis, it would also curtail the affirmative power of Congress to implement its own policies concerning such regulation. See *Philadelphia* v. *New Jersey*, 437 U. S. 617, 621–623 (1978). If Congress chooses to legislate in this area under its commerce power, its regulation need not be more limited in Nebraska than in Texas and States with similar property laws.

---

that expansion face to face with the necessity for irrigation in a way that no previous territorial expansion had."

[14] Soil Conservation Service, U. S. Dept. of Agriculture, America's Soil and Water: Conditions and Trends 21 (1980).

[15] Comptroller General, Report to Congress, Ground Water Overdrafting Must Be Controlled 7–8 (1980).

Ground water overdraft is a national problem and Congress has the power to deal with it on that scale.

## II

Our conclusion that water is an article of commerce raises, but does not answer, the question whether the Nebraska statute is unconstitutional. For the existence of unexercised federal regulatory power does not foreclose state regulation of its water resources, of the uses of water within the State, or indeed, of interstate commerce in water. *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 766–767 (1945); *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 548–549 (1944); *Cooley* v. *Board of Wardens,* 12 How. 299, 319 (1852). Determining the validity of state statutes affecting interstate commerce requires a more careful inquiry:

> "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970) (citation omitted).

The only purpose that appellee advances for § 46–613.01 is to conserve and preserve diminishing sources of ground water. The purpose is unquestionably legitimate and highly important,[16] and the other aspects of Nebraska's ground

---

[16] See *Cities Service Gas Co.* v. *Peerless Oil & Gas Co.,* 340 U. S. 179, 188 (1950) ("Insofar as conservation is concerned, the national interest and the interest of producing states may well tend to coincide").

water regulation demonstrate that it is genuine. Appellants' land in Nebraska is located within the boundaries of the Upper Republican Ground Water Control Area, which was designated as such by the Director of the Nebraska Department of Water Resources based upon a determination that there is "[a]n inadequate ground water supply to meet present or reasonably foreseeable needs for beneficial use of such water supply." Neb. Rev. Stat. § 46–658(1) (Supp. 1981); see App. 56–60. Pursuant to § 46–666(1), the Upper Republican Natural Resources District has promulgated special rules and regulations governing ground water withdrawal and use. See App. 61–82. The rules and regulations define as "critical" those townships in the control area in which the annual decline of the ground water table exceeds a fixed percentage; appellants' Nebraska tract is located within a critical township. The rules and regulations require the installation of flow meters on every well within the control area, specify the amount of water per acre that may be used for irrigation, and set the spacing that is required between wells. They also strictly limit the intrastate transfer of ground water: transfers are only permitted between lands controlled by the same ground water user, and all transfers must be approved by the District Board of Directors. *Id.*, at 68–69.

The State's interest in conservation and preservation of ground water is advanced by the first three conditions in § 46–613.01 for the withdrawal of water for an interstate transfer. Those requirements are "that the withdrawal of the ground water requested is reasonable, is not contrary to the conservation and use of ground water, and is not otherwise detrimental to the public welfare." Although Commerce Clause concerns are implicated by the fact that § 46–613.01 applies to interstate transfers but not to intrastate transfers, there are legitimate reasons for the special treatment accorded requests to transport ground water across state lines. Obviously, a State that imposes severe

withdrawal and use restrictions on its own citizens is not discriminating against interstate commerce when it seeks to prevent the uncontrolled transfer of water out of the State. An exemption for interstate transfers would be inconsistent with the ideal of evenhandedness in regulation. At least in the area in which appellants' Nebraska tract is located, the first three standards of § 46–613.01 may well be no more strict in application than the limitations upon intrastate transfers imposed by the Upper Republican Natural Resources District.

Moreover, in the absence of a contrary view expressed by Congress, we are reluctant to condemn as unreasonable, measures taken by a State to conserve and preserve for its own citizens this vital resource in times of severe shortage. Our reluctance stems from the "confluence of [several] realities." *Hicklin* v. *Orbeck*, 437 U. S. 518, 534 (1978). First, a State's power to regulate the use of water in times and places of shortage for the purpose of protecting the health of its citizens—and not simply the health of its economy—is at the core of its police power. For Commerce Clause purposes, we have long recognized a difference between economic protectionism, on the one hand, and health and safety regulation, on the other. See *H. P. Hood & Sons* v. *Du Mond*, 336 U. S. 525, 533 (1949). Second, the legal expectation that under certain circumstances each State may restrict water within its borders has been fostered over the years not only by our equitable apportionment decrees, see, *e. g.*, *Wyoming* v. *Colorado*, 353 U. S. 953 (1957), but also by the negotiation and enforcement of interstate compacts. Our law therefore has recognized the relevance of state boundaries in the allocation of scarce water resources. Third, although appellee's claim to public ownership of Nebraska ground water cannot justify a total denial of federal regulatory power, it may support a limited preference for its own citizens in the utilization of the resource. See *Hicklin* v. *Orbeck*, *supra*, at 533–534. In this regard, it is relevant that appellee's claim is logically

more substantial than claims to public ownership of other natural resources. See *supra*, at 950–951. Finally, given appellee's conservation efforts, the continuing availability of ground water in Nebraska is not simply happenstance; the natural resource has some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage. See *Reeves, Inc.* v. *Stake*, 447 U. S. 429 (1980); cf. *Philadelphia* v. *New Jersey*, 437 U. S., at 627–628, and n. 6; *Baldwin* v. *Montana Fish and Game Comm'n*, 436 U. S. 371 (1978). A facial examination of the first three conditions set forth in § 46–613.01 does not, therefore, indicate that they impermissibly burden interstate commerce. Appellants, indeed, seem to concede their reasonableness.

Appellants, however, do challenge the requirement that "the state in which the water is to be used grants reciprocal rights to withdraw and transport ground water from that state for use in the State of Nebraska"—the reciprocity provision that troubled the Chief Justice of the Nebraska Supreme Court. Because Colorado forbids the exportation of its ground water,[17] the reciprocity provision operates as an explicit barrier to commerce between the two States. The State therefore bears the initial burden of demonstrating a close fit between the reciprocity requirement and its asserted local purpose. *Hughes* v. *Oklahoma*, 441 U. S., at 336; *Dean Milk Co.* v. *City of Madison*, 340 U. S. 349, 354 (1951).

The reciprocity requirement fails to clear this initial hurdle. For there is no evidence that this restriction is nar-

---

[17] Colorado Rev. Stat. § 37–90–136 (1973) provides as follows:

"For the purpose of aiding and preserving unto the state of Colorado and all its citizens the use of all ground waters of this state, whether tributary or nontributary to a natural stream, which waters are necessary for the health and prosperity of all the citizens of the state of Colorado, and for the growth, maintenance, and general welfare of the state, it is unlawful for any person to divert, carry, or transport by ditches, canals, pipelines, conduits, or any other manner any of the ground waters of this state, as said waters are in this section defined, into any other state for use therein."

rowly tailored to the conservation and preservation rationale. Even though the supply of water in a particular well may be abundant, or perhaps even excessive, and even though the most beneficial use of that water might be in another State, such water may not be shipped into a neighboring State that does not permit its water to be used in Nebraska. If it could be shown that the State as a whole suffers a water shortage, that the intrastate transportation of water from areas of abundance to areas of shortage is feasible regardless of distance, and that the importation of water from adjoining States would roughly compensate for any exportation to those States, then the conservation and preservation purpose might be credibly advanced for the reciprocity provision. A demonstrably arid State conceivably might be able to marshal evidence to establish a close means-end relationship between even a total ban on the exportation of water and a purpose to conserve and preserve water. Appellee, however, does not claim that such evidence exists. We therefore are not persuaded that the reciprocity requirement—when superimposed on the first three restrictions in the statute—significantly advances the State's legitimate conservation and preservation interest; it surely is not narrowly tailored to serve that purpose. The reciprocity requirement does not survive the "strictest scrutiny" reserved for facially discriminatory legislation. *Hughes* v. *Oklahoma, supra,* at 337.[18]

### III

Appellee's suggestion that Congress has authorized the States to impose otherwise impermissible burdens on interstate commerce in ground water is not well founded. The suggestion is based on 37 statutes in which Congress has deferred to state water law, and on a number of interstate compacts dealing with water that have been approved by Congress.

---

[18] The reciprocity requirement cannot, of course, be justified as a response to another State's unreasonable burden on commerce. *Great Atlantic & Pacific Tea Co.* v. *Cottrell,* 424 U. S. 366, 379–381 (1976).

Abstracts of the relevant sections of the 37 statutes relied upon by appellee were submitted in connection with the Hearings on S. 1275 before the Subcommittee on Irrigation and Reclamation of the Senate Committee on Interior and Insular Affairs, 88th Cong., 2d Sess., 302–310 (1964). Appellee refers the Court to that submission but only discusses § 8 of the Reclamation Act of 1902, 32 Stat. 390. That section, it turns out, is typical of the other 36 statutes. It contains two parts. The first provides that "nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation." Such language defines the extent of the federal legislation's pre-emptive effect on state law. *New England Power Co.* v. *New Hampshire*, 455 U. S. 331, 341 (1982); *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27, 49 (1980). The second part provides that "the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws." Such language mandates that questions of water rights that arise in relation to a federal project are to be determined in accordance with state law. See *California* v. *United States*, 438 U. S. 645 (1978).

The interstate compacts to which appellee refers are agreements among States regarding rights to surface water. See The Council of State Governments, Interstate Compacts and Agencies 25–29, 31–32 (1979). Appellee emphasizes a compact between Nebraska and Colorado involving water rights to the South Platte River, see 44 Stat. (part 2) 195, and a compact among Nebraska, Colorado, and Kansas involving water rights to the Republican River, see 57 Stat. 86.

Although the 37 statutes and the interstate compacts demonstrate Congress' deference to state water law,[19] they do not

---

[19] "The history of the relationship between the Federal Government and the States in the reclamation of the arid lands of the Western States is both long and involved, but through it runs the consistent thread of purposeful

indicate that Congress wished to remove federal constitutional constraints on such state laws. The negative implications of the Commerce Clause, like the mandates of the Fourteenth Amendment, are ingredients of the *valid* state law to which Congress has deferred. Neither the fact that Congress has chosen not to create a federal water law to govern water rights involved in federal projects, nor the fact that Congress has been willing to let the States settle their differences over water rights through mutual agreement,[20] constitutes persuasive evidence that Congress consented to the unilateral imposition of unreasonable burdens on commerce. In the instances in which we have found such consent, Congress' "'intent and policy' to sustain state legislation from attack under the Commerce Clause" was "'expressly stated.'" *New England Power Co.* v. *New Hampshire, supra,* at 343 (quoting *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 427 (1946)).[21] Cf. *Merrion* v. *Jicarilla Apache Tribe,* 455 U. S. 130, 155, n. 21 (1982).

The reciprocity requirement of Neb. Rev. Stat. § 46–613.01 (1978) violates the Commerce Clause. We leave to the state courts the question whether the invalid portion is severable. The judgment of the Nebraska Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

and continued deference to state water law by Congress." *California* v. *United States,* 438 U. S., at 653.

[20] Similarly, this Court has encouraged States to resolve their water disputes through interstate compacts rather than by equitable apportionment adjudication. See *Colorado* v. *Kansas,* 320 U. S. 383, 392 (1943).

[21] See, *e. g., Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408 (1946) (McCarran-Ferguson Act, 59 Stat. 33); *International Shoe Co.* v. *Washington,* 326 U. S. 310 (1945) (§ 1606(a) of the Internal Revenue Code, 53 Stat. 1391); *Whitfield* v. *Ohio,* 297 U. S. 431 (1936) (Hawes-Cooper Act, 45 Stat. 1084); *In re Rahrer,* 140 U. S. 545 (1891) (Wilson Act, 26 Stat. 313).

JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, dissenting.

The issue presented by this case, and the only issue, is whether the existence of the Commerce Clause of the United States Constitution by itself, in the absence of any action by Congress, invalidates some or all of Neb. Rev. Stat. § 46–613.01 (1978), which relates to ground water. But instead of confining its opinion to this question, the Court first quite gratuitously undertakes to answer the question of whether the authority of Congress to regulate interstate commerce, conferred by the same provision of the Constitution, would enable it to legislate with respect to groundwater overdraft in some or all of the States.

That these two questions are quite distinct leaves no room for doubt. Congress may regulate not only the stream of commerce itself, but also activities which affect interstate commerce, including wholly intrastate activities. See, *e. g.*, *Kirschbaum Co.* v. *Walling*, 316 U. S. 517 (1942); *United States* v. *Darby*, 312 U. S. 100 (1941); *Houston & Texas R. Co.* v. *United States*, 234 U. S. 342 (1914). The activity upon which the regulatory effect of the congressional statute falls in many of these cases does not directly involve articles of commerce at all. For example, in *Kirschbaum*, the employees were engaged in the operation and maintenance of a loft building in which large quantities of goods for interstate commerce were produced; no one contended that these employees themselves, or the work which they actually performed, dealt with articles of commerce. Nonetheless, the provisions of the Fair Labor Standards Act were applied to them because Congress extended the terms of the Act not only to those who were "engaged in commerce" but also to those who were engaged "in the production of goods for commerce." 316 U. S., at 522.

Thus, the authority of Congress under the power to regulate interstate commerce may reach a good deal further than

the mere negative impact of the Commerce Clause in the absence of any action by Congress. Upon a showing that ground-water overdraft has a substantial economic effect on interstate commerce, for example, Congress arguably could regulate ground-water overdraft, even if ground water is not an "article of commerce" itself. See, *e. g.*, *Hodel* v. *Virginia Surface Mining & Reclamation Assn.*, 452 U. S. 264, 281–283 (1981); *id.*, at 310–313 (REHNQUIST, J., concurring in judgment); *Wickard* v. *Filburn*, 317 U. S. 111 (1942). It is therefore wholly unnecessary to decide whether Congress could regulate ground-water overdraft in order to decide this case; since Congress has not undertaken such a regulation, I would leave the determination of its validity until such time as it is necessary to decide that question.

The question actually involved in this case is whether Neb. Rev. Stat. § 46–613.01 (1978) runs afoul of the unexercised authority of Congress to regulate interstate commerce. While the Court apparently agrees that our equitable apportionment decrees in cases such as *Wyoming* v. *Colorado*, 353 U. S. 953 (1957), and the execution and approval of interstate compacts apportioning water have given rise to "the legal expectation that under certain circumstances each State may restrict water within its borders," *ante*, at 956, it insists on an elaborate balancing process in which the State's "interest" is weighed under traditional Commerce Clause analysis.

I think that in more than one of our cases in which a State has invoked our original jurisdiction, the unsoundness of the Court's approach is manifest. For example, in *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230, 237 (1907), the Court said:

> "This is a suit by a State for an injury to it in its capacity of *quasi*-sovereign. In that capacity the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air."

Five years earlier, in *Kansas* v. *Colorado*, 185 U. S. 125, 142, 145–146 (1902), the Court had made clear that a State's quasi-sovereign interest in the flow of surface and subterranean water within its borders was of the same magnitude as its interest in pure air or healthy forests.

In my view, these cases appropriately recognize the traditional authority of a State over resources within its boundaries which are essential not only to the well-being but often to the very lives of its citizens. In the exercise of this authority, a State may so regulate a natural resource as to preclude that resource from attaining the status of an "article of commerce" for the purposes of the negative impact of the Commerce Clause. It is difficult, if not impossible, to conclude that "commerce" exists in an item that cannot be reduced to possession under state law and in which the State recognizes only a usufructuary right. "Commerce" cannot exist in a natural resource that cannot be sold, rented, traded, or transferred, but only *used.*

Of course, a State may not discriminate against interstate commerce when it regulates even such a resource. If the State allows indiscriminate intrastate commercial dealings in a particular resource, it may have a difficult task proving that an outright prohibition on interstate commercial dealings is not such a discrimination. I had thought that this was the basis for this Court's decisions in *Hughes* v. *Oklahoma*, 441 U. S. 322 (1979), *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923), and *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229 (1911). In each case, the State permitted a natural resource to be reduced to private possession, permitted an *intrastate* market to exist in that resource, and either barred *interstate* commerce entirely or granted its residents a commercial preference.[1]

---

[1] Similarly, in *City of Altus* v. *Carr*, 255 F. Supp. 828 (WD Tex.), summarily aff'd, 385 U. S. 35 (1966), Texas placed no restrictions upon the use or the intrastate sale of ground water. The "rule in Texas was that an

By contrast, Nebraska so regulates ground water that it cannot be said that the State permits any "commerce," intrastate or interstate, to exist in this natural resource. As with almost all of the Western States, Nebraska does not recognize an absolute ownership interest in ground water, but grants landowners only a right to *use ground water on the land from which it has been extracted.* Moreover, the landowner's right to use ground water is limited. Nebraska landowners may not extract ground water "in excess of a reasonable and beneficial use upon the land in which he owns, especially if such use is injurious to others who have substantial rights to the waters, and if the natural underground supply is insufficient for all owners, each is entitled to a reasonable proportion of the whole." *Olson* v. *City of Wahoo*, 124 Neb. 802, 811, 248 N. W. 304, 308 (1933). With the exception of municipal water systems, Nebraska forbids any transportation of ground water off the land owned or controlled by the person who has appropriated the water from its subterranean source. 208 Neb. 703, 710, 305 N. W. 2d 614, 619 (1981). See App. 68–69.

Nebraska places additional restrictions on ground-water users within certain areas, such as the portion of appellants' land situated in Nebraska, where the shortage of ground water is determined to be critical. Water users in appellants' district are permitted only to irrigate the acreage irrigated in 1977, or the average number of acres irrigated between 1972 and 1976, whichever is greater, and must obtain permission from the water district's board before any

owner of land could use all of the percolating water he could capture from the wells on his land for whatever beneficial purposes he needed it, on or off the land, and could likewise sell it to others for use on or off the land and outside the basin where produced, just as he could sell any other species of property." 255 F. Supp., at 833, n. 8. Texas' absolute ownership rule is an anomaly among the Western States. See 5 R. Clark, Waters and Water Rights § 441 (1972 and 1978 Supp.). In Nebraska, as in most of the Western States, ground water is not treated as "any other species of property."

additional acreage may be placed under irrigation. The amount of ground water that may be extracted is strictly limited on an acre-inch-per-irrigated-acre basis. There are also detailed regulations as to the spacing of wells and the use and operation of flow meters. *Id.*, at 71–82.

Since Nebraska recognizes only a limited right to use ground water on land owned by the appropriator, it cannot be said that "commerce" in ground water exists as far as Nebraska is concerned. Therefore, it cannot be said that Neb. Rev. Stat. § 46–613.01 (1978) either discriminates against, or "burdens," interstate commerce. Section 46–613.01 is simply a regulation of the landowner's *right to use* ground water extracted from lands he owns within Nebraska.[2] Unlike the Court, I cannot agree that Nebraska's limitation upon a landowner's right to extract water from his land situated in Nebraska *for his own use* on land he owns in an adjoining State runs afoul of Congress' unexercised authority to regulate interstate commerce.[3]

---

[2] Unlike several other Western States, Nebraska does not entirely forbid ground water extracted in Nebraska to be used in other States. See Brief for City of El Paso as *Amicus Curiae* 2, n. 3. As noted by the Court, Nebraska merely places conditions on such a use of the State's ground water. A permit must be obtained from the Nebraska Department of Water Resources. If the requested withdrawal of ground water is determined to be "reasonable, . . . not contrary to the conservation and use of ground water, and . . . not otherwise detrimental to the public welfare," a permit will be issued so long as the "state in which the water is to be used grants reciprocal rights to withdraw and transport ground water from that state for use in the State of Nebraska." Neb. Rev. Stat. § 46–613.01 (1978).

[3] The Court today invalidates only the reciprocity provision in § 46–613.01. *Ante*, at 957–958. Appellants, however, have never applied for the permit required by the Nebraska statute. I see nothing in the Court's opinion that would preclude the Nebraska Department of Water Resources from prohibiting appellants from transporting ground water into the Colorado portion of their land until they obtain the permit required by the statute. I also see nothing in the Court's opinion that would preclude the Department of Water Resources from denying appellants a permit because of a failure to satisfy the remaining conditions in the statute.